Justice BREYER delivered the opinion of the Court.
*380 The Securities Litigation Uniform Standards Act of 1998 (which we shall refer to as the "Litigation Act") forbids the bringing of large securities class actions based upon violations of state law. It says that plaintiffs may not maintain a class action "based upon the statutory or common law of any State" in which the plaintiffs allege "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security ." 15 U.S.C. § 78bb(f)(1) (emphasis added). The Act defines "class actions" as those involving more than 50 members. See § 78bb(f)(5). It defines "covered security" narrowly to include only securities *381 traded on a national exchange (or, here irrelevant, those issued by investment companies). §§ 78bb(f)(5)(E), 77r(b)(1)-(2).
The question before us is whether the Litigation Act encompasses a class action in which the plaintiffs allege (1) that they "purchase[d]" uncovered securities (certificates of deposit that are not traded on any national exchange), but (2) that the defendants falsely told the victims that the uncovered securities were backed by covered securities. We note that the plaintiffs do not allege that the defendants' misrepresentations led anyone to buy or to sell (or to maintain positions in) covered securities. Under these circumstances, we conclude the Act does not apply.
In light of the dissent's characterization of our holding, post, at 1077 - 1078 (opinion of KENNEDY, j.)-which we believe is incorrect-we specify at the outset that this holding does not limit the Federal Government's authority to prosecute "frauds like the one here." Post, at 1077 - 1078. The Federal Government has in fact brought successful prosecutions against the fraudsters at the heart of this litigation, see infra, at 1074 - 1075, and we fail to understand the dissent's repeated suggestions to the contrary, post, at 1073, 1073 - 1074, 1077 - 1078, 1078, 1081. Rather, as we shall explain, we believe the basic consequence of our holding is that, *1063 without limiting the Federal Government's prosecution power in any significant way, it will permit victims of this (and similar) frauds to recover damages under state law. See infra, at 1079 - 1081. Under the dissent's approach, they would have no such ability.
I
A
The relevant statutory framework has four parts:
(1) Section 10(b) of the underlying regulatory statute, the Securities Exchange Act of 1934. 48 Stat. 891, as amended, 15 U.S.C. § 78j (2012 ed.). This well-known statutory provision forbids the "use" or "employ[ment]" of "any manipulative or deceptive device or contrivance" "in *382 connection with the purchase or sale of any security." § 78j(b).
Securities and Exchange Commission Rule 10b-5 similarly forbids the use of any "device, scheme, or artifice to defraud" (including the making of "any untrue statement of a material fact" or any similar "omi[ssion]") "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (2013).
For purposes of these provisions, the Securities Exchange Act defines "security" broadly to include not just things traded on national exchanges, but also "any note, stock, treasury stock, security future, security-based swap, bond, debenture ... [or] certificate of deposit for a security." 15 U.S.C. § 78c(a)(10). See also §§ 77b(a)(1), 80a-2(a)(36), 80b-2(a)(18) (providing virtually identical definitions of "security" for the Securities Act of 1933, the Investment Company Act of 1940, and the Investment Advisers Act of 1940).
(2) A statute-based private right of action. The Court has read § 10(b) and Rule 10b-5 as providing injured persons with a private right of action to sue for damages suffered through those provisions' violation. See, e.g., Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).
The scope of the private right of action is more limited than the scope of the statutes upon which it is based. See Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 153, 155, 166, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008) (private right does not cover suits against "secondary actors" who had no "role in preparing or disseminating" a stock issuer's fraudulent "financial statements"); Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A., 511 U.S. 164, 179, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (private right does not extend to actions against "aiders and abettors" of securities fraud); Blue Chip Stamps, supra, at 737, 95 S.Ct. 1917 (private right extends only to purchasers and sellers, not to holders, of securities).
(3) The Private Securities Litigation Reform Act of 1995 (PSLRA). 109 Stat. 737, 15 U.S.C. §§ 77z-1, 78u-4.
*383 This law imposes procedural and substantive limitations upon the scope of the private right of action available under § 10(b) and Rule 10b-5. It requires plaintiffs to meet heightened pleading standards. It permits defendants to obtain automatic stays of discovery. It limits recoverable damages and attorney's fees. And it creates a new "safe harbor" for forward-looking statements. See §§ 78u-4, 78u-5.
(4) The Securities Litigation Uniform Standards Act. 112 Stat. 3227, 15 U.S.C. § 78bb(f)(1)(A). As we said at the outset, this 1998 law forbids any
"covered class action based upon the statutory or common law of any State ... by any private party alleging- *1064 "(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
"(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." §§ 78bb(f)(1)(A)-(B).
The law defines "covered security" narrowly. It is a security that "satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933." § 78bb(f)(5)(E). And the relevant paragraphs of § 18(b) of the 1933 Act define a "covered security" as "[a security] listed, or authorized for listing, on a national securities exchange," § 77r(b)(1) (or, though not relevant here, as a security issued by an "investment company," § 77r(b)(2) ). The Litigation Act also specifies that a "covered security" must be listed or authorized for listing on a national exchange "at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred." § 78bb(f)(5)(E).
The Litigation Act sets forth exceptions. It does not apply to class actions with fewer than 51 "persons or prospective class members." § 78bb(f)(5)(B). It does not *384 apply to actions brought on behalf of a State itself. § 78bb(f)(3)(B)(i). It does not apply to class actions based on the law "of the State in which the issuer is incorporated." § 78bb(f)(3)(A)(i). And it reserves the authority of state securities commissions "to investigate and bring enforcement actions." § 78bb(f)(4).
We are here primarily interested in the Litigation Act's phrase "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." § 78bb(f)(1)(A). Unless this phrase applies to the class actions before us, the plaintiffs may maintain their state-law-based class actions, and they may do so either in federal or state court. Otherwise, their class actions are precluded altogether. See § 78bb(f)(2) (providing for the removal from state to federal court of class actions that meet the specifications of paragraph 1, and for the dismissal of such suits by the district court).
B
1
The plaintiffs in these actions (respondents here) say that Allen Stanford and several of his companies ran a multibillion dollar Ponzi scheme. Essentially, Stanford and his companies sold the plaintiffs certificates of deposit in Stanford International Bank. Those certificates "were debt assets that promised a fixed rate of return." Roland v. Green, 675 F.3d 503, 522 (C.A.5 2012). The plaintiffs expected that Stanford International Bank would use the money it received to buy highly lucrative assets. But instead, Stanford and his associates used the money provided by new investors to repay old investors, to finance an elaborate lifestyle, and to finance speculative real estate ventures.
The Department of Justice brought related criminal charges against Allen Stanford. A jury convicted Stanford of mail fraud, wire fraud, conspiracy to commit money laundering, and obstruction of a Securities and Exchange Commission investigation. Stanford was sentenced to prison and required to forfeit $6 billion.
*385 The SEC, noting that the Bank certificates of deposit fell within the 1934 Securities Exchange Act's broad definition of " security," filed a § 10(b) civil case against Allen Stanford, the Stanford International Bank, and related Stanford companies and associates. The SEC won the civil action, and *1065 the court imposed a civil penalty of $6 billion.
2
The plaintiffs in each of the four civil class actions are private investors who bought the Bank's certificates of deposit. Two groups of plaintiffs filed their actions in Louisiana state court against firms and individuals who helped sell the Bank's certificates by working as "investment advisers" affiliated with Stanford, or who provided Stanford-related companies with trust, insurance, accounting, or reporting services. (The defendants included a respondent here, SEI Investments Company.) The plaintiffs claimed that the defendants helped the Bank perpetrate the fraud, thereby violating Louisiana state law.
Two other groups of plaintiffs filed their actions in federal court for the Northern District of Texas. One group sued Willis of Colorado (and related Willis companies) and Bowen, Miclette & Britt, two insurance brokers; the other group sued Proskauer Rose and Chadbourne & Parke, two law firms. Both groups claimed that the defendants helped the Bank (and Allen Stanford) perpetrate the fraud or conceal it from regulators, thereby violating Texas securities law.
The Louisiana state-court defendants removed their cases to federal court, and the Judicial Panel on Multi-District Litigation moved the Louisiana cases to the Northern District of Texas. A single federal judge heard all four class actions.
The defendants in each of the cases moved to dismiss the complaints. The District Court concluded that the Litigation Act required dismissal. The court recognized that the certificates of deposit themselves were not "covered securities" under the Litigation Act, for they were not " 'traded nationally [or] listed on a regulated national exchange.' "
*386 App. to Pet. for Cert. in No. 12-86, p. 62. But each complaint in one way or another alleged that the fraud included misrepresentations that the Bank maintained significant holdings in " 'highly marketable securities issued by stable governments [and] strong multinational companies,' " and that the Bank's ownership of these "covered" securities made investments in the uncovered certificates more secure. Id., at 66. The court concluded that this circumstance provided the requisite statutory "connection" between (1) the plaintiffs' state-law fraud claims, and (2) "transactions in covered securities." Id., at 64, 66-67. Hence, the court dismissed the class actions under the Litigation Act. Id., at 75. See also 675 F.3d, at 511.
All four sets of plaintiffs appealed. The Fifth Circuit reversed. It agreed with the District Court that the complaints described misrepresentations about the Bank's investments in nationally traded securities. Still, the "heart, crux, and gravamen of" the "allegedly fraudulent scheme was representing ... that the [uncovered] CDs were a 'safe and secure' investment that was preferable to other investments for many reasons." Id. , at 522. The court held that the falsehoods about the Bank's holdings in covered securities were too " 'tangentially related' " to the "crux" of the fraud to trigger the Litigation Act. Id. , at 520, 522 (quoting Madden v. Cowen & Co., 576 F.3d 957, 965-966 (C.A.9 2009) ). "That the CDs were marketed with some vague references to [the Bank's] portfolio containing instruments that might be [covered by the Litigation Act] seems tangential to the schemes," to the point where the complaints fall outside the scope of that Act. 675 F.3d, at 522.
Defendants in the four class actions sought certiorari. We granted their petitions.
*1066 II
The question before us concerns the scope of the Litigation Act's phrase "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered *387 security." § 78bb(f)(1)(A). How broad is that scope? Does it extend further than misrepresentations that are material to the purchase or sale of a covered security?
In our view, the scope of this language does not extend further. To put the matter more specifically: A fraudulent misrepresentation or omission is not made "in connection with" such a "purchase or sale of a covered security" unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a "covered security." We add that in Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006), we held that the Litigation Act precluded a suit where the plaintiffs alleged a "fraudulent manipulation of stock prices" that was material to and " 'coincide[d]' with" third-party securities transactions, while also inducing the plaintiffs to "hold their stocks long beyond the point when, had the truth been known, they would have sold." Id., at 75, 85, 89, 126 S.Ct. 1503 (citing United States v. O'Hagan, 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) ). We do not here modify Dabit .
A
We reach this interpretation of the Litigation Act for several reasons. First, the Act focuses upon transactions in covered securities, not upon transactions in uncovered securities. An interpretation that insists upon a material connection with a transaction in a covered security is consistent with the Act's basic focus.
Second, a natural reading of the Act's language supports our interpretation. The language requires the dismissal of a state-law-based class action where a private party alleges a "misrepresentation or omission of a material fact" (or engages in other forms of deception, not relevant here) "in connection with the purchase or sale of a covered security." § 78bb(f)(1). The phrase "material fact in connection with the purchase or sale" suggests a connection that matters. And for present purposes, a connection matters where the misrepresentation makes a significant difference to someone's decision to purchase or to sell a covered security, not *388 to purchase or to sell an uncovered security, something about which the Act expresses no concern. See generally Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. ----, ----, 131 S.Ct. 1309, 1317-1319, 179 L.Ed.2d 398 (2011) (a misrepresentation or omission is "material" if a reasonable investor would have considered the information significant when contemplating a statutorily relevant investment decision). Further, the "someone" making that decision to purchase or sell must be a party other than the fraudster. If the only party who decides to buy or sell a covered security as a result of a lie is the liar, that is not a " connection" that matters.
Third, prior case law supports our interpretation. As far as we are aware, every securities case in which this Court has found a fraud to be "in connection with" a purchase or sale of a security has involved victims who took, who tried to take, who divested themselves of, who tried to divest themselves of, or who maintained an ownership interest in financial instruments that fall within the relevant statutory definition. See, e.g., Dabit, supra, at 77, 126 S.Ct. 1503 (Litigation Act: victims were "holders" of covered securities that the defendant's fraud caused to become overvalued); SEC v. Zandford, 535 U.S. 813, 822, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)
*1067 (§ 10(b): victims were "duped into believing" that the defendant would " 'invest' their assets in the stock market"); Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 592, 121 S.Ct. 1776, 149 L.Ed.2d 845 (2001) (§ 10(b): victim purchased an oral option to buy 10% of a company's stock); O'Hagan,supra, at 655-656, 117 S.Ct. 2199 (§ 10(b): victims were "members of the investing public" harmed by the defendant's "gain[ing of an] advantageous market position" through insider trading); Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co., 404 U.S. 6, 10, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (§ 10(b): victim was "injured as an investor" when the fraud deprived it of "compensation for the sale of its valuable block of securities"). We have found no Court case involving a fraud "in connection with" the purchase or sale of a statutorily defined security in which the victims did not fit one of these descriptions. And the dissent apparently has not either.
*389 Although the dissent characterizes our approach as "new," post, at 1073, and tries to describe several of our prior cases, such as Zandford or Dabit, in a different way, post, at 1079 - 1080, it cannot escape the fact that every case it cites involved a victim who took, tried to take, or maintained an ownership position in the statutorily relevant securities through "purchases" or "sales" induced by the fraud. E.g., Zandford, supra, at 815, 820, 122 S.Ct. 1899 (fraudster told customers he would " 'conservatively invest' their money" in the stock market and made sales of "his customer's securities," but pocketed the proceeds (emphasis added)); Dabit, supra, at 76, 85, 89, 126 S.Ct. 1503 (the " misrepresentations and manipulative tactics caused [the plaintiffs] to hold onto overvalued securities" while also inducing third parties to trade them); In re Orlando Joseph Jett, 82 S.E.C. Docket 1211, 1236-1237 (2004) (trader's scheme "greatly inflated the reporting trading profits" that his firm "used to determine ... the amount of capital he was permitted to commit on the firm's behalf " (emphasis added)).
Fourth, we read the Litigation Act in light of and consistent with the underlying regulatory statutes, the Securities Exchange Act of 1934 and the Securities Act of 1933. The regulatory statutes refer to persons engaged in securities transactions that lead to the taking or dissolving of ownership positions. And they make it illegal to deceive a person when he or she is doing so. Section 5 of the 1933 Act, for example, makes it unlawful to "offer to sell or offer to buy ... any security, unless a registration statement has been filed as to such security." 15 U.S.C. § 77e(c). Section 17 of the 1933 Act makes it unlawful "in the offer or sale of any securities ... to employ any device, scheme, or artifice to defraud, or to obtain money or property by means of any untrue statement of a material fact." §§ 77q(a)(1)-(2). And § 10(b) of the 1934 Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance." § 78j(b).
*390 Not only language but also purpose suggests a statutory focus upon transactions involving the statutorily relevant securities. The basic purpose of the 1934 and 1933 regulatory statutes is "to insure honest securities markets and thereby promote investor confidence." See O'Hagan, supra, at 658, 117 S.Ct. 2199. Nothing in the regulatory statutes suggests their object is to protect persons whose connection with the statutorily defined securities is more remote than words such as "buy," "sell," and the like, indicate. Nor does anything in the Litigation Act provide us *1068 with reasons for interpreting its similar language more broadly.
The dissent correctly points out that the federal securities laws have another purpose, beyond protecting investors. Namely, they also seek to protect securities issuers, as well as the investment advisers, accountants, and brokers who help them sell financial products, from abusive class-action lawsuits. Post, at 1074 - 1075. Both the PSLRA and the Litigation Act were enacted in service of that goal. By imposing heightened pleading standards, limiting damages, and pre-empting state-law suits where the claims pertained to covered securities, Congress sought to reduce frivolous suits and mitigate legal costs for firms and investment professionals that participate in the market for nationally traded securities.
We fail to see, however, how our decision today undermines that objective. The dissent worries our approach will "subject many persons and entities whose profession it is to give advice, counsel, and assistance in investing in the securities markets to complex and costly state-law litigation." Post, at 1074. To the contrary, the only issuers, investment advisers, or accountants that today's decision will continue to subject to state-law liability are those who do not sell or participate in selling securities traded on U.S. national exchanges. We concede that this means a bank, chartered in Antigua and whose sole product is a fixed-rate debt instrument not traded on a U.S. exchange, will not be able to claim *391 the benefit of preclusion under the Litigation Act. But it is difficult to see why the federal securities laws would be-or should be-concerned with shielding such entities from lawsuits.
Fifth, to interpret the necessary statutory "connection" more broadly than we do here would interfere with state efforts to provide remedies for victims of ordinary state-law frauds. A broader interpretation would allow the Litigation Act to cover, and thereby to prohibit, a lawsuit brought by creditors of a small business that falsely represented it was creditworthy, in part because it owns or intends to own exchange-traded stock. It could prohibit a lawsuit brought by homeowners against a mortgage broker for lying about the interest rates on their mortgages-if, say, the broker (not the homeowners) later sold the mortgages to a bank which then securitized them in a pool and sold off pieces as "covered securities." Brief for Sixteen Law Professors as Amici Curiae 24.
The dissent all but admits this. Its proposed rule is that whenever "the purchase or sale of the securities [including by the fraudster] is what enables the fraud," the Litigation Act pre-empts the suit. Post, at 1078. In other words, any time one person convinces another to loan him money, by pretending he owns nationally traded securities or will acquire them for himself in the future, the action constitutes federal securities fraud, is subject to federal enforcement, and is also precluded by the Litigation Act if it qualifies as a "covered class action" under § 78bb(f)(5)(B) (e.g., involves more than 50 members). Leaving aside whether this would work a significant expansion of the scope of liability under the federal securities laws, it unquestionably would limit the scope of protection under state laws that seek to provide remedies to victims of garden-variety fraud.
The text of the Litigation Act reflects congressional care to avoid such results. Under numerous provisions, it purposefully maintains state legal authority, especially *392 over matters that are primarily of state concern. See §§ 78bb(f)(1)(A)-(B) (limiting preclusion to lawsuits involving "covered," i.e., nationally traded, securities); § 78bb(f) (4) (providing that the "securities *1069 commission ... of any State shall retain jurisdiction under the laws of such State to investigate and bring enforcement actions"); § 78bb(f)(3)(B) (preserving States' authority to bring suits of the kind forbidden to private class-action plaintiffs). See also 112 Stat. 3227 ("Congress finds that ... it is appropriate to enact national standards for securities class action lawsuits involving nationally traded securities, while preserving the appropriate enforcement powers of State securities regulators"). A broad interpretation of the Litigation Act works at cross-purposes with this state-oriented concern. Cf. Zandford, 535 U.S., at 820, 122 S.Ct. 1899 (warning against "constru[ing]" the phrase "in connection with" "so broadly as to convert any common-law fraud that happens to involve securities into a violation of § 10(b)"); Wharf (Holdings) Ltd., 532 U.S., at 596, 121 S.Ct. 1776 (recognizing that "ordinary state breach-of-contract claims" are "actions that lie outside the [Securities Exchange] Act's basic objectives").
B
Respondents and the Government make two important counterarguments. Respondents point to statements we have made suggesting we should give the phrase "in connection with" a broad interpretation. In Dabit, for example, we said that the Court has consistently "espoused a broad interpretation" of "in connection with" in the context of § 10(b) and Rule 10b-5, and we added that the Litigation Act language similarly warranted a "broad construction." 547 U.S., at 85-86, 126 S.Ct. 1503. In Bankers Life, we said that, if a deceptive practice "touch[es]" a securities transaction, it meets § 10(b)'s "in connection with" requirement, 404 U.S., at 12, 92 S.Ct. 165, and in O'Hagan, we said the fraud and the purchase or sale of a security must simply "coincide." 521 U.S., at 656, 117 S.Ct. 2199. The idea, we explained in Zandford, is that the phrase "should be 'construed *393 not technically and restrictively, but flexibly to effectuate its remedial purposes.' " 535 U.S., at 819, 122 S.Ct. 1899 (quoting Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) ).
Every one of these cases, however, concerned a false statement (or the like) that was "material" to another individual's decision to "purchase or s[ell]" a statutorily defined "security" or "covered security." Dabit,supra, at 75-77, 126 S.Ct. 1503; Zandford, supra, at 822, 122 S.Ct. 1899; Wharf (Holdings) Ltd.,supra, at 590-592, 121 S.Ct. 1776; O'Hagan, supra, at 655-657, 117 S.Ct. 2199; Bankers Life, supra, at 10, 92 S.Ct. 165. And the relevant statements or omissions were material to a transaction in the relevant securities by or on behalf of someone other than the fraudster.
Second, the Government points out that § 10(b) of the Securities Exchange Act also uses the phrase "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). And the Government warns that a narrow interpretation of "in connection with" here threatens a similarly narrow interpretation there, which could limit the SEC's enforcement capabilities. See Brief for United States as Amicus Curiae 28.
We do not understand, however, how our interpretation could significantly curtail the SEC's enforcement powers. As far as the Government has explained the matter, our interpretation seems perfectly consistent with past SEC practice. For one thing, we have cast no doubt on the SEC's ability to bring enforcement actions against Stanford and Stanford International Bank. The SEC has already done so successfully. As we have repeatedly pointed *1070 out, the term "security" under § 10(b) covers a wide range of financial products beyond those traded on national exchanges, apparently including the Bank's certificates of deposit at issue in these cases. No one here denies that, for § 10(b) purposes, the "material" misrepresentations by Stanford and his associates were made "in connection with" the "purchases" of those certificates. *394 We find it surprising that the dissent worries that our decision will "narro [w] and constric[t] essential protection for our national securities market,"post, at 1073, and put "frauds like the one here ... not within the reach of federal regulation," post, at 1077 - 1078. That would be news to Allen Stanford, who was sentenced to 110 years in federal prison after a successful federal prosecution, and to Stanford International Bank, which was ordered to pay billions in federal fines, after the same. Frauds like the one here-including this fraud itself -will continue to be within the reach of federal regulation because the authority of the SEC and Department of Justice extends to all "securities," not just to those traded on national exchanges. 15 U.S.C. § 78c(a)(10) ; accord, § 77b(a)(1), § 80a-2(a)(36), § 80b-2(a)(18). When the fraudster peddles an uncovered security like the CDs here, the Federal Government will have the full scope of its usual powers to act. The only difference between our approach and that of the dissent, is that we also preserve the ability for investors to obtain relief under state laws when the fraud bears so remote a connection to the national securities market that no person actually believed he was taking an ownership position in that market.
Thus, despite the Government's and the dissent's hand wringing, neither has been able to point to an example of any prior SEC enforcement action brought during the past 80 years that our holding today would have prevented the SEC from bringing. At oral argument, the Government referred to an administrative proceeding, In re Richard Line, 62 S.E.C. Docket 2879 (1996), as its best example. Our examination of the report of that case, however, indicates that the defendant was a fraudster to whom the fraud's victims had loaned money, expecting that he would purchase securities on their behalf. Id., at 2880 ("Line represented to investors that he would invest their non-admitted assets in various securities, including U.S. Treasury notes, mutual fund shares, and collateralized debt obligations"); ibid. ("[He] fabricated *395 account statements which falsely recited that securities had been purchased on behalf of certain investors").
The Government's brief refers to two other proceedings as demonstrating the SEC's broad § 10(b) enforcement powers. Each, however, involved defrauded investors who had tried to take an ownership interest in the relevant securities. Jett, 82 S.E.C. Docket, at 1251 (involving a § 10(b) action where a defrauded trading firm's "decision to purchase or 'invest' in strips or bonds ... stemmed directly from the activity that constituted the fraud"); In re D.S. Waddy & Co., 30 S.E.C. 367, 368 (1949) (involving a § 10(b) action where a broker "appropriated to his own use money paid to him by customers for securities purchases"). We have examined SEC records without finding any further examples.
For these reasons, the dissent's warning that our decision will "inhibit" "litigants from using federal law to police frauds" and will "undermine the primacy of federal law in policing abuses in the securities markets" rings hollow. Post, at 1073 - 1074, 1074 - 1075. The dissent cannot point to one example of a federal securities action-public or private-that would have been permissible in the past *1071 but that our approach will disallow in the future. And the irony of the dissent's position is that federal law would have precluded private recovery in these very suits, because § 10(b) does not create a private right of action for investors vis-à-vis "secondary actors" or "aiders and abettors" of securities fraud. Stoneridge Investment Partners, 552 U.S., at 152, 155, 128 S.Ct. 761; Central Bank of Denver, 511 U.S., at 180, 114 S.Ct. 1439; accord, Brief for Petitioners in No. 12-86, p. 46 ("Any federal securities action against Petitioners would clearly run afoul of Central Bank and Stoneridge "); Brief for Respondents 48 (same); Brief for United States as Amicus Curiae 28 (same).
III
Respondents' complaints specify that their claims rest upon their purchases of uncovered, not of covered, securities.
*396 Our search for allegations that might bring their allegations within the scope of the Litigation Act reveals the following:
(1) The first set of Texas plaintiffs alleged that they bought certificates of deposit from Stanford International Bank because they were told "the CDs issued by SIB were safer even than U.S. bank-issued CDs" and "could be redeemed at any time," given that the Bank "only invested the money [i.e., the Bank's money obtained from its certificate sale proceeds] in safe, secure, and liquid assets." App. 433. They claimed Stanford "touted the high quality of SIB's investment portfolio," and such falsehoods were material to their decision to purchase the uncovered certificates. Id., at 444.
(2) The second set of Texas plaintiffs contended that they, too, purchased the Bank's certificates on the belief "that their money was being invested in safe, liquid investments." Id., at 715. They alleged that the Bank's marketing materials stated it devoted "the greater part of its assets" to "first grade investment bonds (AAA, AA+, AA) and shares of stock (of great reputation, liquidity, and credibility)." Id., at 744 (emphasis deleted).
(3) Both groups of Louisiana plaintiffs alleged that they were induced to purchase the certificates based on misrepresentations that the Bank's assets were " 'invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks.' " Id., at 253, 345. And they claimed the " 'liquidity/marketability of SIB's invested assets' " was "the most important factor to provide security to SIB clients." Id., at 254.
These statements do not allege, for Litigation Act purposes, misrepresentations or omissions of material fact "in connection with" the "purchase or sale of a covered security." At most, the complaints allege misrepresentations about the Bank's ownership of covered securities-fraudulent assurances that the Bank owned, would own, or would use the victims' money to buy for itself shares of covered securities.
*397 But the Bank is an entity that made the misrepresentations. The Bank is the fraudster, not the fraudster's victim. Nor is the Bank some other person transacting (or refraining from transacting, see Dabit, 547 U.S., at 75-77, 126 S.Ct. 1503) in covered securities. And consequently, there is not the necessary " connection" between the materiality of the misstatements and the statutorily required "purchase or sale of a covered security." See supra, at 1076.
A final point: The District Court found that one of the plaintiffs acquired Bank certificates "with the proceeds of selling" covered securities contained in his IRA portfolio. App. to Pet. for Cert. in No. 12-86, p. 70. The plaintiffs, however, *1072 did not allege that the sale of these covered securities (which were used to finance the purchase of the certificates) constituted any part of the fraudulent scheme. Nor did the complaints allege that Stanford or his associates were at all interested in how the plaintiffs obtained the funds they needed to purchase the certificates. Thus, we agree with the Court of Appeals that "[u]nlike Bankers Life and Zandford, where the entirety of the fraud depended upon the tortfeasor convincing the victims of those fraudulent schemes to sell their covered securities in order for the fraud to be accomplished, the allegations here are not so tied with the sale of covered securities." 675 F.3d, at 523. In our view, like that of the Court of Appeals, these sales constituted no relevant part of the fraud but were rather incidental to it.
For these reasons the Court of Appeals' judgment is affirmed.
It is so ordered.