# United States Court of Appeals
## For the First Circuit

No. 12-2128

CÉSAR A. CALDERÓN SERRA,
TERESITA PALERM NEVARES a/k/a TESSIE CALDERÓN,

Plaintiffs, Appellants,

v.

BANCO SANTANDER PUERTO RICO, d/b/a Santander Puerto Rico
Corporation, f/k/a Banco Central Hispano, JOSÉ R. GONZÁLEZ; JUAN
S. MORENO; MARÍA CALERO; JOSÉ ÁLVAREZ; JAMES RODRÍGUEZ; HÉCTOR
CALVO; LOAN OFFICER A; LOAN OFFICER B; LOAN OFFICER C; INSURANCE
COMPANY A; INSURANCE COMPANY B; INSURANCE COMPANY C,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Thompson, Lipez, and Kayatta,
Circuit Judges.

Osvaldo Carlo Linares, with Carlo Defendini Díaz and
Pagán, Ortega & Defendini Law Offices, PSC, on brief, for
appellants.
Néstor M. Méndez Gómez and Sara L. Vélez Santiago, with
whom Jason R. Aquiló-Suro and Pietrantoni Méndez & Alvarez LLC were
on brief, for appellees.

March 26, 2014

**KAYATTA, Circuit Judge**. Plaintiffs press a RICO claim against their bank and others over what they claim was an unlawful scheme to lend plaintiffs money in violation of federal margin requirements limiting the extent to which securities can be used as collateral for funds loaned to purchase the securities. Granting a motion to dismiss the complaint, the district court rejected plaintiffs' RICO clam because the claim was based on conduct that would have been actionable as securities fraud. On appeal, plaintiffs argue that the district court erred because the complaint does not allege fraud "in connection" with the purchase of securities. We disagree, and we also sustain the district court's unrelated ruling that plaintiffs failed to properly serve the summons and complaint on two of the defendants.

## I. Background

César A. Calderón Serra and Teresita Palerm Nevares (also known as Tessie Calderón) sue Banco Santander Puerto Rico ("the Bank");[1] several officers or employees of the Bank or its parent company (José R. González, Juan S. Moreno, María Calero, José Álvarez, and Loan Officers A, B, and C); an officer of Santander Securities Corporation, a wholly-owned subsidiary of the Bank (James Rodríguez); an officer of Santander Insurance Agency (Héctor Calvo); and several insurance companies which plaintiffs claim

---

[1] Plaintiffs name the Bank as a defendant in the alternative, based on a potential wrinkle in their RICO liability theory. For present purposes, we treat the Bank as a defendant.

hold relevant insurance policies. Because the bulk of this appeal arises from the district court's dismissal of plaintiffs' second amended complaint[2] under Federal Rule of Civil Procedure 12(b)(6), we will assume the factual allegations in that complaint to be true and draw from them any reasonable inferences suggested by plaintiffs.

The Bank makes money, in part, by making loans to its customers. The Bank's subsidiary, Santander Securities, makes money by selling and buying securities for its customers. Most of the individual defendants earn salaries, commissions, bonuses, and other benefits when the Bank and Santander Securities conduct those same transactions. The Bank enticed plaintiffs, with what plaintiffs thought were fixed-rate loans, to borrow money from the Bank to buy and trade securities through Santander Securities. The problem, plaintiffs claim, is that the Bank intentionally concealed, with false documentation and otherwise, that the entire arrangement violated Regulation U, 12 C.F.R. Ch. II, Pt. 221, a regulation issued by the Board of Governors of the Federal Reserve

---

[2] We use "second amended complaint" to refer to the document titled "Amended Complaint" which plaintiffs filed on November 2, 2011, as distinct from the "First Amended Complaint," which was attached to plaintiffs' earlier motion for leave to amend but which was not separately filed on the docket after that motion was granted.

Board pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq.[3]  See 12 C.F.R. § 221.1(a).

By its express terms, Regulation U "imposes credit restrictions upon persons other than brokers or dealers (hereinafter lenders) that extend credit for the purpose of buying or carrying margin stock if the credit is secured directly or indirectly by margin stock."  12 C.F.R. § 221.1(b)(1).  "Margin stock" includes "[a]ny equity security registered . . . on a national securities exchange."  Id. § 221.2.  In pertinent part, Regulation U prohibits banks from loaning more than a certain percentage of the value of the security used to secure the loan, see id. § 221.3, thereby typically ensuring that the purchaser has some of his own funds invested, and reducing the extent to which holders of securities are over-leveraged.  See Capital Mgmt. Select Fund Ltd. v. Bennett, 680 F.3d 214, 221-22 & n.9 (2d Cir. 2012) ("In general, margin restrictions [including Regulation U] attempt to reduce the counterparty risk associated with margin financing by limiting the types of securities that can be posted by an investor as collateral for a margin loan and limiting the amounts that can be borrowed against that collateral.").

---

[3]  Plaintiffs allege that defendants may have "misrepresented these transactions purposely . . . to federal regulators" and that "[t]he loans were represented and booked by [the Bank] under loan purposes, as being legal and proper, and no impropriety . . . was mentioned to plaintiffs."

The alleged violation of the margin requirements might have benefited plaintiffs had the stock trading been successful. Apparently, it was not. After roughly $9 million in trades, plaintiffs suffered a loss of nearly $3 million (including the cost of borrowing). Plaintiffs in effect allege that had the Bank not loaned them the money, they would never have bought so many securities, and thus not suffered as large a loss.

Plaintiffs sued, ultimately pursuing two claims under federal law. First, they sought to maintain a private cause of action under Regulation U. Second, in apparent pursuit of treble damages and attorneys' fees, they asserted a cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

The district court dismissed the second amended complaint as to two defendants for failure of service. It then dismissed the remainder of the suit for failure to state a claim upon which relief could be granted. In making the latter ruling, the court found, first, that there is no private right of action for a violation of Regulation U. Second, the court found that the alleged misconduct was not actionable under RICO, which, as amended, does not encompass private claims that would have been "actionable as fraud in the purchase or sale of securities." Private Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67, § 107, 109 Stat. 737 (1995), amending 18 U.S.C. § 1964(c).

Plaintiffs appeal both the dismissal of their RICO claim and the district court's determination that service was defective as to some defendants. Plaintiffs do not appeal the finding that Regulation U provides no private right of action for its breach.

## II. Analysis

**A.      The district court correctly concluded that plaintiffs failed to state a claim for relief under RICO.**

Because the district court dismissed the case at the pleading stage as inadequate to state a claim for relief, our consideration on appeal of arguments plaintiffs have properly preserved and presented is de novo. See Haag v. United States, 736 F.3d 66, 69 (1st Cir. 2013).

"Fraud in the sale of securities" is listed as a RICO predicate act. 18 U.S.C. § 1961(1). For a time, this opportunity to use a securities fraud claim as a predicate act for a RICO claim allowed private litigants to use RICO to threaten treble damage liability in securities litigation. See Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 327 (3d Cir. 1999). In response, Congress adopted the PSLRA, which generally bars private plaintiffs from bringing RICO claims based on "any conduct that would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c); Bald Eagle Area Sch. Dist., 189 F.3d at 327. Congress meant not only to "eliminate securities fraud as a predicate offense in a civil RICO action, but also to prevent a plaintiff from pleading other specified offenses, such as

mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." Bald Eagle Area Sch. Dist., 189 F.3d at 327 (alteration marks omitted) (internal quotation marks omitted).

Applying the PSLRA's bar on RICO claims requires a sort of reverse Rule 12(b)(6) inquiry:  we ask whether the conduct in question would be "actionable as fraud in the purchase or sale of securities," in which case a RICO count based on such fraud as a predicate act is not actionable.  18 U.S.C. § 1964(c); see Fed. R. Civ. P. 12(b)(6).  Actions for fraud in the purchase or sale of securities often arise under section 10(b) of the Securities Exchange Act of 1934 and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5.  See 15 U.S.C. § 78j (prohibiting the use of "manipulative or deceptive device[s]" that violate SEC rules "in connection with the purchase or sale of any security"); 17 C.F.R. § 240.10b-5 (prohibiting, inter alia, fraudulent schemes and misleading omissions of material fact "in connection with the purchase or sale of any security"); see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008) (noting the availability of an implied private right of action for 10b-5 violations).  A typical 10b-5 securities fraud claim requires proof of: "'(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss;

-7-

and (6) loss causation.'"  Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

In contending that the "bank fraud" they claim to describe in their complaint was not actionable under Rule 10b-5, plaintiffs make only one argument:  that the fraud was not in "connection with the purchase or sale of a security."  We shall limit our consideration accordingly.  See Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011) ("[C]ourts are generally limited to addressing the claims and arguments advanced by the parties.").  As for why such a connection is lacking, plaintiffs provide little insight.  They seem to draw a distinction between obtaining the loans and using the loaned funds to purchase securities.  As the plaintiffs put it, the bank loans "made possible the subsequent transactions," and "[w]ithout these loans at extremely low rates these transactions would not have come about."  Thus, we surmise that the crux of their argument is that the alleged fraud arose "in connection with" the issuance of the loans, and not "in connection with" the purchase of securities made possible through the loan proceeds.  For the following reasons, we reject this argument.

First, the complaint itself, as ultimately amended, draws a tight connection between the alleged fraud and the purchase of securities.  The stated facts commence with an allegation that

-8-

"Defendants caused $5,000,000.00 worth of securities to be traded in the name of the Plaintiffs."  Plaintiffs explain that each purchase was "initially funded entirely on credit."  The fraudulent scheme itself is described thus:  "Defendants engaged in a continuous and ongoing scheme to grant loans for the purchase of securities to various clients, without complying with Regulation U margin requirements . . . ."  Plaintiffs further depict all defendants at the bank, its parent company, and its broker-dealer subsidiary as jointly engaged in a single scheme, pursuant to which the bank "loans were extended exclusively for the purchase of securities at Santander Securities . . . ."  Furthermore, the damages sought equaled the change in the value of the purchased securities, plus margin interest and minus any interest earned. And the undisclosed material fact at the heart of the alleged fraud was the existence of Regulation U, applicable precisely because the purpose of the loans was to buy securities.

Second, the case law interpreting and applying the "in connection with" requirement of Rule 10b-5 and related statutes (referred to sometimes as the "transactional nexus" requirement) offers no basis for finding such a tightly alleged connection to be inadequate.  As a remedial statute, the Exchange Act and its transactional nexus are to be interpreted "flexibly," although not "so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)."  SEC v. Zandford,

535 U.S. 813, 819-20 (2002) (internal quotation marks omitted). Accordingly, in <u>Zandford</u>, the Court found a sufficient nexus between deceit and a securities transaction where the defendant wrote himself a check from his client's discretionary account, knowing that securities would be sold to cover the draft. <u>Id.</u> at 820-21. Here, the defendants loaned money for the purpose of purchasing securities, all or most of which, it appears, were to be held in a pledge collateral account securing the loan.

In cases with materially similar facts to ours, two other circuits have allowed causes of action under Rule 10b-5 to proceed. At least at the motion to dismiss phase, the Third Circuit found the existence of a sufficient nexus between a failure to disclose the interest terms of margin trading accounts and the subsequent purchase of securities in the accounts. <u>Angelastro</u> v. <u>Prudential-Bache Sec., Inc.</u>, 764 F.2d 939, 943-45 (3d Cir. 1985).[4] Earlier, the Ninth Circuit concluded that misleading statements about stock reports and the risks of buying on margin in a declining market, as part of "a scheme to induce [the plaintiff] to borrow money from [the defendant and] to engage in

---

[4] Acknowledging the concern that allowing the action might logically lead to liability for "other lending institutions which made credit available for use in stock market transactions," <u>id.</u> at 945, the court opted for a case-by-case approach, and noted that not "every bank loan for the purpose of purchasing securities is necessarily within the purview of section 10(b). We decide only the issue certified to us by the district court." <u>Id</u>. We follow that wise example here, where, as we explain, the connection involves more than the purpose of the loan.

commission-producing securities purchases through [the defendant]" also satisfied the transactional nexus. <u>Arrington</u> v. <u>Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 651 F.2d 615, 618-19 (9th Cir. 1981).

In the context of a more traditional 10b-5 case dealing with a false or misleading stock tip, the Fourth Circuit identified four (non-exhaustive) factors relevant to whether a particular case satisfies the transactional nexus:

> (1) whether a securities sale was necessary to the completion of the fraudulent scheme; (2) whether the parties' relationship was such that it would necessarily involve trading in securities; (3) whether the defendant intended to induce a securities transaction; and (4) whether material misrepresentations were disseminated to the public in a medium upon which a reasonable investor would rely.

<u>SEC</u> v. <u>Pirate Investor LLC</u>, 580 F.3d 233, 244 (4th Cir. 2009) (citations omitted) (quotation marks omitted). As we see it, only the first three factors are sensibly relevant to an assessment of this case, and all three are satisfied by plaintiffs' complaint. According to the complaint, the purpose of the scheme was both to make loans and to sell securities; accordingly, selling securities was a necessary component of the scheme and integral to the relationship between the plaintiffs and the defendants. And the complaint specifically alleges that "[t]he scheme was designed to produce interest," benefits, and commissions for the defendants, including both the Bank and Santander Securities.

The Supreme Court has also construed parallel "in connection with" language in the Securities Litigation Uniform Standards Act (SLUSA), which was adopted to further the same goals as, and correct an unintended consequence of, the PSLRA. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71 (2006). In so doing, the Court explained that Rule 10b-5's "in connection with" requirement is satisfied where "the fraud alleged 'coincide[s]' with a securities transaction--whether by the plaintiff or by someone else." Id. at 85. Just this term, the Court reaffirmed Dabit but clarified that "[a] fraudulent misrepresentation or omission is not made 'in connection with'" the purchase or sale of the securities covered by the SLUSA "unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'". Chadbourne & Parke LLP v. Troice, 134 S. Ct. 1058, 1066 (2014).

The fraud as alleged here was material to--indeed generated--the purchase of securities covered by the Exchange Act and Rule 10b-5. There has been no dispute as to whether the plaintiffs actually bought securities covered by the Exchange Act (in fact, they specifically allege that Regulation U governed the transactions). And, although plaintiffs endeavored to plead around how central securities are to the alleged fraudulent scheme, their pleading makes clear their theory that, but for the alleged misrepresentations and omissions, the plaintiffs would have bought

-12-

fewer, if any, securities. (Hence their harm was driven at least in part by the fall in the value of the securities.) As such, the alleged misrepresentations and omissions were necessarily material to the plaintiffs' decision to purchase securities, and so the misrepresentations and omissions were "in connection with" those securities transactions.

We also note that this is not a case where the proceeds of an independent fraud simply happened to be invested in securities, or where plaintiffs obtained the money they later invested in a fraudulent scheme by selling securities. Cf. Zandford, 535 U.S. at 820; Troice, 134 S. Ct. at 1071-72. Nor do plaintiffs allege a scheme in which securities played only an incidental or "happenstance" role. Rezner v. Bayerische Hypo-Und Vereinsbank AG, 630 F.3d 866, 871-72 (9th Cir. 2010) (finding no PSLRA preemption where plaintiff pledged an interest in his bond-holding account as substitute collateral in a loan scheme to produce tax losses, as "the securities were merely a happenstance cog in the scheme."); see also Troice, 134 S. Ct. at 1068 (distinguishing the Supreme Court's construction of the "in connection with" requirement from an interpretation that would cover a borrower who misrepresented his creditworthiness by claiming that he held or would buy securities, or that would reach a mortgage broker who misrepresented a loan's interest rate and then sold the mortgage to a bank that securitized it); Ouwinga v.

<u>Benistar 419 Plan Servs., Inc.</u>, 694 F.3d 783, 791 (6th Cir. 2012) (concluding that the PSLRA did not preempt a claim relating to an abusive tax shelter, structured as a benefit plan that purchased variable life insurance policies (securities), because "the fraud and the securities transactions were essentially independent events.").[5]

In sum, if the defendants fraudulently misrepresented or failed to disclose the Regulation U margin lending restrictions as part of a scheme to induce plaintiffs to purchase more securities than they otherwise would have, such fraud would have been "in connection with" the purchase or sale of securities within the meaning of Rule 10b-5. Accordingly, the district court was correct to reject what is plaintiffs' sole argument on appeal for evading the PSLRA bar in this action.

---

[5] We have also considered <u>Anatian</u> v. <u>Coutts Bank (Switzerland) Ltd.</u>, 193 F.3d 85, 87-88 (2d Cir. 1999), which holds that claimed fraud relating to a series of loans was too far removed from any securities transactions to support a Rule 10b-5 claim. So far as we can tell, it is at least questionable whether the <u>Anatian</u> complaint would have satisfied the second and third <u>Pirate Investor</u> factors (namely, whether the parties' relationship would necessarily involve, or the defendants meant to induce, securities transactions). <u>See Anatian</u> v. <u>Coutts Bank, Switzerland, Ltd.</u>, 97 CIV. 9280 (JSR), 1998 WL 526440, at *1-2 (S.D.N.Y. Aug. 21, 1998) <u>aff'd</u> 193 F.3d 85 (2d Cir. 1999). In any event, <u>Anatian</u> does not apply here, where the nexus to a securities sale is both more direct and more central to the scheme.

**B.** **The district court did not abuse its discretion in dismissing the complaint as to two defendants for failure of service.**

We review for abuse of discretion a dismissal for insufficient service of process. Crispin-Taveras v. Municipality of Carolina, 647 F.3d 1, 6 (1st Cir. 2011).[6]

Under Federal Rule of Civil Procedure 4, absent contrary federal law, one way that a plaintiff may serve a defendant is by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made[.]" Fed. R. Civ. P. 4(e), (e)(1). See also Senior Loiza Corp. v. Vento Dev. Corp., 760 F.2d 20, 23 (1st Cir. 1985) (applying the prior version of the rule to Puerto Rico).

Puerto Rico amended its Rules of Civil Procedure in 2009, and the new rules have not yet been officially translated. Calderón Serra v. Banco Santander P.R., No. 3:10-cv-1906-GAG, 2012 WL 3067609, at *3 n.1 (D.P.R. July 30, 2012) (citing P.R. Law Ann. tit. 32, app. V, R. 4.6).[7] According to the defendants'

---

[6] Somewhat surprisingly, in view of the potentially different preclusive effects of dismissals under Rules 12(b)(6) and 12(b)(5), defendants have not volunteered to waive their lack of service defense in the event that we affirm the RICO dismissal, nor do plaintiffs waive their appeal of the Rule 12(b)(5) dismissal in the event of such an affirmance. We therefore reach this issue, which was the basis for the district court's dismissal as to defendants Calvo and Moreno.

[7] However, as the district court observed, the new Rule 4.6 largely mirrors the former Rule 4.5. Id.

-15-

translation, which plaintiffs do not appear to materially challenge, the current rule provides:

> (a) The court shall issue an order providing for a summons by publication when the person to be served is outside of Puerto Rico or . . . could not be located even after pertinent efforts have been made . . . and it is proved to the satisfaction of the court through an affidavit stating the efforts made . . . . The order shall provide that the summons shall be published only once in a newspaper of general circulation in Puerto Rico. The order shall also provide that, within the ten (10) days following the publication of the summons, the defendant shall be sent a copy of the summons and of the complaint filed . . . to his/her last known address, unless a sworn statement is made justifying that in spite of the reasonable steps taken, which shall be stated, it has been impossible to find any address of the defendant, in which case the court will excuse compliance of this provision.

Plaintiffs sought service by publication for three defendants: José Álvarez, Juan Moreno Blanco ("Moreno"), and Héctor Calvo. To show their efforts at personal service,[8] plaintiffs offered an affidavit from private investigator Andrés Amador. Regarding Moreno and Calvo, Amador averred that his efforts turned up a last known address but little current information beyond suggestions that each had left Puerto Rico. He reported that Álvarez's name was too common to produce workable leads, and records checks had proved unavailing. The district court granted the motion.

---

[8] Plaintiffs' initial motion was denied for lack of an affidavit, and so we focus here on their second motion for service by publication, which was granted.

-16-

No one disputes that each summons was properly published. Plaintiffs, however, failed to mail the defendants a copy of the summons and complaint post-publication. Accordingly, the three defendants moved to dismiss the complaint for insufficient service of process. See Fed. R. Civ. P. 12(b)(5). The court granted the motion as to Moreno and Calvo, noting that Amador's affidavit gave a last known address for each, and so process should have been mailed there. Calderón Serra, 2012 WL 3067609, at *4-5. The court denied the motion as to Álvarez, however, concluding that although there was no post-publication demonstration that it was impossible to find his last known address, the original Amador affidavit sufficed for that purpose. Id.[9]

On appeal, plaintiffs claim that because Amador's affidavit showed that there was no known current address for any of the three defendants, no mailing was necessary. This view is contrary to the plain language of the Rule, which requires mailing even where there is no current address, so long as the plaintiff has a "last known address." Indeed, were a current Puerto Rico address known, service by publication would likely have been unavailable. We therefore agree with the district court that plaintiffs should have mailed the summons and complaint to Moreno and Calvo's last known addresses.

---

[9] Later, the district court dismissed the action sua sponte as to Álvarez when it dismissed the rest of the case. Id. at *6.

The Puerto Rico cases cited in plaintiffs' Rule 28(j) letter do not compel the contrary result. See Fed. R. App. P. 28(j). Quoting Banco Popular v. S.L.G. Negron, 164 D.P.R. 855 (P.R. June 2, 2005) (trans.), plaintiffs suggest that the district court should have ordered re-service, not dismissal. Cf. id. at 874. However, their opening brief on appeal argued only that plaintiffs complied with Rule 4.6, not that the sanction for failure was too harsh.[10] They have thus forfeited the latter claim. See Lattab v. Ashcroft, 384 F.3d 8, 17 (1st Cir. 2004). Moreover, in Banco Popular, where the defendant's investigator found a relative of the plaintiffs at their last known address, the Supreme Court of Puerto Rico held that mailing the wrong version of a summons after publication was inadequate service. Banco Popular, 164 D.P.R. at 861, 874. Failure to mail anything is at least as grave as mailing the wrong thing. Thus, on the issue of whether service here was adequate, Banco Popular is of no help to plaintiffs.

Plaintiffs also offer a Puerto Rico Court of Appeals opinion affirming a decision to waive the post-publication mailing requirement for lack of a known "effective" address for the

_____

[10]   Plaintiffs' brief asserts that the "denial of excusing Appellants from their compliance with Rule 4.6 is clearly arbitrary." In context, however, this appears to be an objection to the finding that plaintiffs did not satisfy the Rule. If it was intended to convey anything else, it is so cryptic as to waive the point. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

-18-

defendants, such that there was no "reasonable possibility to inform the respondent of the claim filed against him." Maldonado Pena v. Bear Guerrero, FAC2008-3621(403), 2010 WL 4394296 (TCA), at *3-4 (P.R. Cir. July 8, 2010) (trans.) (internal quotation marks omitted). This case is persuasive authority as to Puerto Rico law, see CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 962 F.2d 77, 91 (1st Cir. 1992), but distinguishable. Unlike in Maldonado, the district court here did not excuse the plaintiffs from the mailing requirement ex ante--nor, it seems, did plaintiffs ask it to. While it perhaps would not have been an abuse of discretion for the district court to grant such a request had plaintiffs made it (a question we need not decide), we see no error in the district court's refusal to sanction plaintiffs' decision to presume that compliance with the clear language of the rule would be excused. As such, we affirm the district court's dismissal of the complaint as to Moreno and Calvo for failure of service.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is **affirmed**.