Jessica ZWEIMAN, executrix of the Estate of Anne Zweiman, on behalf of herself and all others similarly situated, Plaintiff,

v.

AXA EQUITABLE LIFE INSURANCE COMPANY, Defendant.

14–CV–5012 (VSB)

United States District Court, S.D. New York.

Signed September 30, 2015

Barbara J. Hart, David Charles Harrison, Sung–Min Lee, Thomas Michael Skelton, Lowey Dannenberg Cohen & Hart, P.C., White Plains, NY, Edward F. Haber, Shapiro Haber & Urmy, L.L.P., Boston, MA, James Gerard Flynn, Joel C. Feffer, Harwood Feffer LLP, New York, N.Y., Counsel for Plaintiff

Jay B. Kasner, Kurt William Hemr, Tansy Woan, Skadden, Arps, Slate, Meagher & Flom LLP, New York, N.Y., Counsel for Defendant

## MEMORANDUM & ORDER

VERNON S. BRODERICK, United States District Judge:

This is a putative class action commenced by Plaintiff Jessica Zweiman on behalf of herself and other variable annuity policy holders as customers of Defendant AXA Equitable Life Insurance Co. ("AXA") alleging that AXA breached its contractual duties to them by implementing a volatility management strategy for its variable annuity policies. Presently pending before me are: (1) Plaintiff's motion to remand the Complaint to New York State Supreme Court, Westchester County under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub L. No. 105–353, 112 Stat. 3227 (codified at 15 U.S.C. §§ 77p, 78bb(f)); and (2) Defendant's motion to dismiss the Complaint as precluded by SLUSA. Plaintiff's Complaint is precluded by SLUSA because it: (1) involves a covered class action; (2) asserts a state common law breach of contract cause of action; (3) concerns covered securities; and (4) contains allegations when viewed realistically assert misrepresentations or omissions of a material fact in connection with the purchase or sale of its variable annuities.

Therefore, Plaintiff's motion to remand is DENIED, and AXA's motion to dismiss is GRANTED.

## I. *The Annuity Cases*

This is the second putative class action commenced by Plaintiff Jessica Zweiman.[1] The first action, *Zweiman v. AXA Equitable Life Insurance Co.,* 14–CV–3128 ("*Zweiman I*"), was commenced in this Court on May 2, 2014. *Zweiman I* was one of four putative class actions commenced in this District, around the same time, by holders of AXA variable annuities concerning AXA's use of a volatility management strategy with regard to these annuities—the others being: *O'Donnell v. AXA Equitable Life Insurance Co.,* No. 14–CV–2209; *Swallow v. AXA Equitable Life Insurance Co.,* No. 14–CV–3505; and *Cabral v. AXA Equitable Life Insurance Co.,* No. 14–CV–3715 (collectively with *Zweiman I,* the "Annuity Cases"). *O'Donnell* was the first filed case and was assigned to me. (*See* No. 14–CV–2209, Doc. 2.) Subsequently, the other Annuity Cases were filed and marked as related to *O'Donnell* and were assigned to me. (*See e.g.,* No. 14–CV–2209, Doc. 2; No. 14–CV–3128, Doc. 2; No. 14–CV–3505, Doc. 2; No. 14–CV–3715, Doc. 2.)

On June 5, 2014, AXA filed a letter in the *O'Donnell* case indicating: (1) its intention to seek to dismiss each of the Annuity Cases based on lack of subject matter jurisdiction; (2) asking for the briefing of the motions to be phased so that the subject matter jurisdiction issue could be considered first; and (3) suggesting that the initial pretrial conference scheduled for July 11, 2014 in *O'Donnell* also serve as the initial pretrial conference in the other Annuity Cases. (No. 14–CV–2209, Doc. 14.) At the time of AXA's June 5th letter AXA had not been served in two of the other Annuity Cases. (*Id.*) The letter also indicated that on or before June 16, 2014, in accordance with my Individual Rules & Practices In Civil Cases ("Individual Rules"), AXA would submit in the *O'Donnell* action a letter requesting a premotion conference in connection with its anticipated motion to dismiss the complaint in that action for lack of subject matter jurisdiction. (*Id.*) I issued an order scheduling the initial conference in the An-

---

1. Plaintiff Jessica Zweiman is the executrix of the estate of Anne Zweiman, her mother.

(Doc. 17 at 4.) I will refer to both Jessica and Anne Zweiman as Plaintiff.

nuity Cases for July 11, 2014. (No. 14–CV–2209, Doc. 15.)

On June 16, 2014, AXA submitted a pre-motion letter in *O'Donnell* requesting a premotion conference concerning its proposed motion to dismiss for lack of subject matter jurisdiction. (No. 14–CV–2209, Doc. 16.) In its letter, AXA pointed out that the sole basis for jurisdiction asserted by Plaintiff in *O'Donnell* was the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453. (*Id.*) AXA argued that CAFA "excludes from its scope any class action that solely involves a claim … concerning a covered security" as defined in SLUSA. (*Id.* 1–2 (internal quotation marks omitted).) Since there was no other bases of jurisdiction AXA argued that the *O'Donnell* complaint must be dismissed. (*Id.* at 2.) Under Rule 4.A of my Individual Rules, O'Donnell had three business days within which to file his opposition to AXA's pre-motion letter. On June 19, 2014, rather than file his opposition to AXA's pre-motion letter, O'Donnell voluntarily dismissed his action. (No. 14–CV–2209, Doc. 17.) On that same day, the plaintiffs in the other Annuity Cases also voluntarily dismissed their claims. (No. 14–CV–3128, Doc. 12; No. 14–CV–3505, Doc. 7; No. 14–CV–3715, Doc. 11.)

## II. *Procedural History*

Plaintiff commenced this putative class action by filing a complaint in the Supreme Court of the State of New York, County of Westchester, Index No. 59638/2014, on June 19, 2014. (Compl.)[2] The Complaint was served on AXA on June 24, 2014, (Doc. 1 ¶ 1), and on July 3, 2014, AXA

removed this action to this Court, (Doc. 1). On July 3 AXA also filed a Related Case Statement indicating that the case was related to the Annuity Cases that had been pending before me. (Doc. 4.) On July 11, 2014, I entered a stipulation and order extending AXA's time to answer up to August 29, 2014. (Doc. 8.) Defendant filed a pre-motion letter on July 21, 2014 to request a conference in anticipation of filing a motion to dismiss the Complaint on the basis that "SLUSA precludes Zweiman from bringing her putative class action for breach of contract under state law."[3] (Doc. 11.) The case was accepted as related on July 21, 2014. (Docket Entry, July 21, 2014. On July 24, 2014, Plaintiff filed her response to Defendant's pre-motion letter stating her intention to file a motion to remand that would "address the same threshold issue as AXA's motion to dismiss," and suggesting that AXA's request for a pre-motion conference be denied as duplicative. (Doc. 15.)

On July 30, 2014, Plaintiff filed her motion to remand this action back to the Supreme Court of New York, (Doc. 16), and memorandum of law, (Pl.'s Remand Mem.)[4]. On that same day, I issued an order directing the parties to appear for a pre-motion conference on August 6, 2014. (Doc. 19.) At the pre-motion conference the parties discussed Plaintiff's motion to remand and AXA's proposed motion to dismiss on the basis that the Complaint is precluded by SLUSA, and I set a briefing schedule. (Doc. 25.) On September 5, 2014, AXA filed its opposition to Zweiman's motion to remand and cross-moved to dismiss the action as precluded by SLU-

---

**2.** "Compl." refers to the Class Action Complaint. (Doc. 1–1.)

**3.** Rule 4.A of my Individual Rules indicates that a party's submission of a pre-motion letter seeking leave to file a pre-answer motion

to dismiss will stay that party's obligation to answer.

**4.** "Pl.'s Remand Mem." refers to the Memorandum of Law in Support of Plaintiff's Motion to Remand. (Doc. 17.)

SA. (Def.'s Remand Opp & MTD.)[5] Plaintiff replied in further support of her motion to remand and opposed AXA's motion to dismiss on September 19, 2014. (Pl.'s Remand Reply & MTD Opp.)[6] On September 25, 2014, AXA replied in further support of its motion to dismiss. (Def.'s MTD Reply)[7]

### III. Background [8]

Plaintiff Zweiman purchased a variable annuity contract from AXA with an initial contribution of $245,044.40, pursuant to a contract dated October 16, 2008 (the "Contract").[9] (Hemr Decl. Ex. 3, at 5–6.)[10] "A variable annuity is a tax-deferred retirement vehicle that allows the individual to choose from a selection of investments and then pays the individual a level of income in retirement that is determined by the performance of such investments." (Consent Order 3 n.2.)[11] Variable annuities are "'hybrid products,'" possessing character-

istics of both insurance products and investment securities," *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 105 (2d Cir.2001), are primarily sold by insurance companies, and must be offered through "separate accounts" that are registered with the Securities and Exchange Commission ("SEC") as investment companies under the Investment Company Act of 1940, *Winne v. Equitable Life Assurance Soc'y of U.S.*, 315 F.Supp.2d 404, 408 (S.D.N.Y.2003) (internal citation omitted); 15 U.S.C. § 80a–1 *et seq.*

Plaintiff Zweiman's Contract permitted her to choose among several investment options, which were maintained in Separate Account No. 49. (Contract 7–9, 24; Prospectus 1.)[12] Each of these investment options corresponded to shares of mutual fund portfolios. (Prospectus 1.) Plaintiff Zweiman initially chose the Guaranteed Interest investment option and reallocated

---

5. "Def.'s Remand Opp. & MTD" refers to the Memorandum of Law of AXA Equitable Life Insurance Company (A) in Support of its Motion to Dismiss the Complaint as Precluded by the Securities Litigation Uniform Standards Act and (B) in Opposition to Plaintiff's Motion to Remand. (Doc. 28.)

6. "Pl.'s Remand Reply & MTD Opp." refers to the Plaintiff's Memorandum in Further Support of Her Motion to Remand and in Opposition to Defendant's Motion to Dismiss. (Doc. 30.)

7. "Def. MTD Reply" refers to AXA Equitable Life Insurance Company's Reply Memorandum of Law in Further Support of Its Motion to Dismiss the Complaint as Precluded by the Securities Litigation Uniform Standards Act. (Doc. 31.)

8. For the purpose of resolving these motions, I assume all the allegations contained in the Complaint to be true, drawing all reasonable inferences in favor of Plaintiff. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir.2012). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings. I

also may consider any documents incorporated by reference into the Complaint, and documents publicly filed with the SEC. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007).

9. "Contract" refers to Anne Zweiman's AXA Variable Annuity Contract No. 3–0865884, dated October 16, 2008, part 1 of 2. (Hemr Decl. Ex. 3.) The citations to the Contract page numbers correspond with the page numbers designated on the Electronic Case Filing System ("ECF").

10. "Hemr Decl." refers to the Declaration of Kurt Wm. Hemr (A) in Support of Motion of AXA Equitable Life Insurance Company to Dismiss the Complaint as Precluded by the Securities Litigation Uniform Standards Act and (B) in Opposition to Plaintiff's Motion to Remand. (Doc. 29.)

11. "Consent Order" refers to the New York State Department of Financial Services Consent Order. (Hemr Decl. Ex, 1, at 12–21.)

12. "Prospectus" refers to Hemr Decl. Ex. 5. (Doc. 29–5.)

her entire contribution in twelve monthly increments to the AXA Conservative–Plus Allocation Portfolio.[13] (Contract 6, 9, 24; Prospectus 30–32; Hemr Decl. Ex. 8, at 2.) "[The AXA Conservative–Plus Allocation Portfolio] is a 'fund of funds' in the AXA Premier VIP Trust which is itself invested in a mix of portfolios within the EQ Advisors Trust." (Def.'s Remand Opp. & MTD 5–6.) Under the Guaranteed Interest option, Plaintiff Zweiman paid a premium to guarantee that certain benefits would increase by a minimum percentage each year. (Compl. ¶ 9.) This, combined with policy reset provisions, provided that the value of these guaranteed benefits could only increase and never decrease. (*Id.*)

AXA established and maintained the Separate Accounts in accordance with the laws of New York State. (Contract 24.) Section 2.04 of Plaintiff's Contract provided, in part, that AXA had the right, "subject to compliance with applicable law:"

(a) to add Investment Funds (or subfunds of Investment Funds) to, or to remove Investment Funds (or subfunds) from, the Separate Account, or to add other separate accounts;

(b) to combine any two or more Investment Funds or sub-funds thereof; ... [and]

(h) to cause one or more Investment Funds to invest some or all of their assets in one or more other trusts or investment companies.

(Contract 26.) Section 2.04 further provided that "[i]f the exercise of these rights results in a material change in the underlying investment of a Separate Account,"

AXA was required to notify Zweiman that it had exercised its right, as required by law. (*Id.* at 27.)

In May of 2009, AXA introduced a volatility management strategy designed to tactically manage equity exposure to Standard & Poor's ("S & P") 500 companies based on the level of volatility in the market. Specifically, AXA disclosed through the EQ Advisors Trust Prospectus dated May 27, 2009, that it was introducing this volatility management strategy[14] to the EQ Advisors Trust through new AXA Tactical Manager ("ATM") portfolios. (*See generally* 5/27 Prospectus.)[15] The EQ Advisors Trust Prospectus stated the following:

During normal market conditions, it is expected that each Portfolio will invest substantially all of its assets in long positions on the S & P 500 Index. When the models indicate that market volatility is increasing above specific thresholds set for each Portfolio, the Portfolio may limit its exposure to the S & P 500 Index.... This investment strategy is intended to reduce the overall risk of investing in the equity securities of companies represented in the S & P 500 Index, but may result in a Portfolio underperforming that index during certain periods.

(5/27 Prospectus 6, 7.)

By prospectus supplement dated August 12, 2009, AXA made a similar disclosure indicating that its volatility management strategy may apply to existing portfolios, such as the AXA Allocation Portfolio group

**13.** The AXA Conservative–Plus Allocation Portfolio is one of five portfolios that AXA refers to as the "AXA Allocation" portfolios. (Prospectus 1.)

**14.** The Complaint refers to the volatility management strategy as the ATM Strategy. (Compl. ¶ 1.)

**15.** "5/27 Prospectus" refers to Hemr Decl. Ex. 6. (Doc. 29–6.) The citations to the 5/27 Prospectus page numbers correspond with the page numbers designated on ECF.

(to which Plaintiff's AXA Conservative–Plus Allocation Portfolio is a member). (*See e.g.*, 8/12 Prospectus 2 ("The Portfolio utilizes a strategy that combines a passive investment index style focused on equity securities of large capitalization companies with an actively managed futures and options strategy that will be used to tactically manage equity exposure to such companies based on the level of volatility in the market.").)[16]

On February 19, 2010, Zweiman decided to reallocate all of her account value out of the AXA Conservative–Plus Allocation Portfolio and into seven separate investment portfolios. (Hemr Decl. Ex. 8.) The volatility management strategy did not apply to these portfolios. (Def.'s Remand Opp. & MTD 7.) Zweiman then reallocated approximately one-third of her account into two different investment funds on June 21, 2013. (Hemr Decl. Ex. 10.)

New York Insurance Law Section 4240(e) required AXA to file with the New York State Department of Financial Services ("DFS")[17] a request to amend and restate its Plans of Operation for any changes that AXA made to its separate accounts:

> No authorized insurer shall make any such agreement in this state providing for the allocation of amounts to a separate account until such insurer has filed with the superintendent a statement as to its methods of operation of such separate account and the superintendent has approved such statement.... In determining whether or not to approve any such statement, the superintendent shall consider, among other things, the history, reputation and financial stability of the insurer and the character, experience, responsibility, competence and general fitness of the officers and directors of the insurer. If the insurer files an amendment of any such statement with the superintendent that does not change the investment policy of a separate account and the superintendent does not approve or disapprove such amendment within a period of thirty days after such filing, such amendment shall be deemed to be approved as of the end of such thirty day period.... An amendment of any such statement that changes the investment policy of a separate account shall be treated as an original filing.

N.Y. Ins. Law § 4240(e). In accordance with Section 4240(e), AXA filed requests to amend and restate its Plans of Operation in 2009, 2010, and 2011 for various separate accounts—including Separate Account No. 49—with DFS. (Consent Order ¶ 2.)

In 2011, DFS investigated AXA's disclosure to DFS of its volatility management strategy. (*Id.* at 1.) At the conclusion of that investigation, AXA and DFS entered into a Consent Order on March 17, 2014. (*Id.*)

According to the Consent Order, DFS determined that AXA's Plans of Operation failed to adequately inform and adequately explain to DFS that existing variable annuity policyholders (like Plaintiff) who had not elected to participate in the volatility management strategy could nevertheless have this strategy applied to their policies. (*Id.* ¶ 3.) Many variable annuity policyholders paid a premium for guaranteed

---

**16.** "8/12 Prospectus" refers to Hemr Decl. Ex. 7. (Doc. 29–7.) The citations to the 8/12 Prospectus page numbers correspond with the page numbers designated on ECF.

**17.** "DFS was created by transferring the functions of the New York State Banking Department and the New York State Insurance Department into a new agency. This transfer of functions became effective on October 3, 2011." (Consent Order 1.)

benefits because they were interested in making more aggressive investments to capture market rises. (*Id.* ¶ 6.) However, according to DFS, AXA's volatility management strategy could limit potential gains by holders of variable annuities during highly volatile markets thereby changing the nature of the products that these policyholders purchased. (*Id.* ¶¶ 5, 8.) Specifically, DFS found that:

> The changes effectively changed the nature of the product that the policyholders purchased, yet AXA did not explain in its filings to the Department that it was making such changes to its variable annuity products. The absence of detail and discussion in the filings regarding the significance of the implementation of the ATM Strategy had the effect of misleading the Department regarding the scope and potential effects of the ATM Strategy on the relevant funds and the possible consequences for policyholders.... DFS approved the filings because it was led to believe that the changes were merely routine additions of funds and similar alterations. Had [DFS] been aware of the extent of the changes, it may have required that the existing policyholders affirmatively opt in to the [volatility management strategy].

(*Id.* ¶¶ 8, 9.)

Although AXA did not affirmatively admit to any wrongdoing as part of the Consent Order, DFS found that AXA violated Section 4240(e) "by filing the Plans of Operation with ... DFS without adequately informing and explaining to the Department the significance of the changes to the insurance product." (*Id.* ¶¶ 10, 11.) As part of the Consent Order, AXA agreed to pay a civil fine, provide DFS-approved communications to policyholders when AXA revises fund choices relating to its volatility management strategy, and cer-

tain other relief. (Consent Order 12–16.) DFS did not, however, withdraw its approvals of AXA's 2009, 2010, and 2011 amended and restated Plans of Operation, order AXA to cease its volatility management strategy, or otherwise order AXA to take steps to inform existing policyholders of the strategy. (*See id.*)

Zweiman seeks to represent a class of individuals who purchased variable annuities from AXA, which subsequently became subject to the ATM Strategy, and who suffered injury as a result. (Compl. ¶ 16.)

## IV. *Applicable Law*

■ "The magnitude of the federal interest in protecting the integrity of efficient operation of the market for nationally traded securities cannot be overstated." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 78, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). Congress has therefore enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") and SLUSA to regulate the purchase and sale of securities and the securities industry. Congress intended for the PSLRA to curb abuses of the class-action vehicle in litigation involving nationally traded securities—abuses that Congress perceived to be harming the U.S. economy. *Id.* at 81, 126 S.Ct. 1503; *see also* 15 U.S.C. § 78u–4(b). The House Conference Report related to the PSLRA noted that "nuisance filings, targeting deep-pocket defendants, vexatious discovery requests, and 'manipulation by class action lawyers of the clients whom they purportedly represent' had become rampant in recent years." *Dabit,* 547 U.S. at 81, 126 S.Ct. 1503. To remedy these harms, the PSLRA imposed uniform standards on federal securities fraud class actions, including a limitation on damages and attorney's fees, a "safe harbor" for

forward looking statements, mandated imposition of sanctions for frivolous litigation, and a heightened pleading standard in actions brought under Section 10(b) and Rule 10b–5. *Id.* at 81–82, 126 S.Ct. 1503.

 To avoid the restrictions of the PSLRA, members of the plaintiffs' bar increasingly sought to bring class actions under state law in state court. *Id.* at 82, 126 S.Ct. 1503. As a consequence, Congress enacted SLUSA in 1998 to stem the tidal wave of state private securities class action lawsuits alleging fraud, which was frustrating the objectives of the PSLRA. *Id.* Under SLUSA, covered class actions involving covered securities that allege securities fraud under state law are removable to federal court where they must be dismissed. *Romano v. Kazacos,* 609 F.3d 512, 518 (2d Cir.2010). A class action is properly removed to federal court if the state action is: (1) a "covered class action," (2) based on state statutory or common law; (3) concerning a covered security; and (4) alleging that defendants made a misrepresentation or omission of a material fact or used or employed any manipulative device or contrivance in connection with the purchase or sale of that security. 15 U.S.C. § 78bb(f)(*l*); *see also Romano,* 609 F.3d at 517–18. When determining whether a complaint is covered by SLUSA, courts may apply the "artful pleading rule" and "look beyond the face of the ... complaint[ ] to determine whether [it] allege[s] securities fraud in connection with the purchase or sale of covered securities." *Romano,* 609 F.3d at 519; *accord In re Kingate Mgmt. Ltd. Litig.,* 784 F.3d 128, 140

(2d Cir.2015) [18]; *In re Herald,* 730 F.3d 112, 119 (2d Cir.2013) *cert. denied sub nom. Trezziova v. Kohn,* —— U.S. ——, 135 S.Ct. 1701, —— L.Ed.2d —— (2015). A court can consider materials outside of the complaint under review, including "documents appended to a notice of removal or a motion to remand that convey information essential to the court's jurisdictional analysis." *Romano,* 609 F.3d at 520.

## V. *Discussion*

Plaintiff concedes that the Complaint's allegations involve a covered class action, based on state statutory or common law, and concern a covered security thereby satisfying the first three requirements for SLUSA preclusion. (Pl.'s Remand Mem. 6–7.) However, the parties disagree regarding whether AXA made a misrepresentation or omission of a material fact or used or employed any manipulative device or contrivance in connection with the purchase or sale of its variable annuities.

### A. *Misrepresentation or Omissions of Material Fact*

 Plaintiff contends that her Complaint alleges a single straightforward breach of contract claim based upon AXA's violation of New York Insurance Law Section 4240(e). (*See generally* Pl.'s Remand Mem. 7–10.) Zweiman concedes that AXA made misstatements and/or omissions in its DFS filings, (Pl.'s Remand Reply & MTD Opp. 20 ("AXA's alleged misconduct relating to the DFS involved misstatements and omissions in AXA's filings").) [19]

---

18. During the pendency of this motion, the Second Circuit issued its opinion in *In re Kingate,* 784 F.3d 128 (2d Cir.2015), which is relevant to the issues presented in this case. The parties have provided me with letters containing their argument related to this supplemental authority, all of which I have considered in my decision. (Docs. 32–33.)

19. Plaintiff seems to be attempting to mitigate this admission by citing to *Mills v. Polar Molecular Corp.,* 12 F.3d 1170 (2d Cir.1993), for the proposition that a breach of contract claim does not manifest fraud absent an allegation that the defendant never intended to perform the contract. (Pl.'s Remand Reply & MTD Opp. 8.) As an initial matter, *Mills*

Indeed, it is these very misrepresentations and omissions that constitute the violation of law that Zweiman relies upon in bringing her lawsuit. However, Zweiman argues that AXA improperly injects an additional theory of liability into the Complaint that does not exist—that AXA failed to notify policyholders of a material change as required by the Contract. (Pl.'s Remand Reply & MTD Opp. 5–9.) I disagree; Zweiman's attempt to excise this necessary allegation from her breach of contract claim in an effort to save her Complaint from preclusion is unavailing.

■ . In its recent decision, *In re Kingate*, 784 F.3d 128, the Second Circuit set forth the following standard governing whether an allegation is precluded by SLUSA: first, there is an allegation of a misrepresentation or omission; second, the allegation is of conduct by the defendant; and third, the allegation is necessary to liability under the state law claims. *See id.* at 142. In applying this standard, the Second Circuit reemphasized that a plaintiff may "not evade SLUSA by camouflaging allegations that satisfy this standard in the guise of allegations that do not." *Id.*

at 149. Courts must therefore look to the substance of a complaint's allegations rather than conduct "a formalistic search through the pages of the complaint for magic words" to determine whether a complaint sounds in fraud. *See Romano,* 609 F.3d at 520. As such, a plaintiff cannot avoid the application of SLUSA by removing covered words from its complaint but leaving in the covered concepts. *See Segal v. Fifth Third Bank, N.A.,* 581 F.3d 305, 310–11 (6th Cir.2009). In this regard, courts have utilized prior iterations of a plaintiff's complaint to serve as an interpretive tool.[20] *See Dudek v. Prudential Sec., Inc.,* 295 F.3d 875, 879–80 (8th Cir. 2002); *see also In re Herald,* 730 F.3d at 119 & n. 6 (finding evidence of artful pleading where the plaintiffs' amended complaint removed references to prior federal securities fraud claims but was based on same underlying "realities" of prior complaint). My analysis therefore encompasses a careful review of the allegations in the instant Complaint, the *Zweiman I* complaint,[21] and the underlying Contract at issue in this case.

concerned whether a plaintiff's fraud claims satisfied the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, and it predates SLUSA. In any event, the Second Circuit has since affirmed dismissal of breach of contract claims under SLUSA absent the requirement that there must be an allegation that the defendant secretly did not intend to perform. *See Romano,* 609 F.3d at 515–16, 521–22 (affirming dismissal of breach of contract claim premised upon misrepresentations or omissions); *Gray v. Seaboard Sec., Inc.,* 126 Fed.Appx. 14, 17 (2d Cir.2005) (summary order) (affirming dismissal of breach of contract claim based upon the provision of investment advice "that purported to be something it was not").

**20.** Plaintiff's reliance on *Dluhos v. Floating & Abandoned Vessel, Known as New York,* 162 F.3d 63, 68 (2d Cir.1998) for the general proposition "that an amended complaint ordinarily supersedes the original, and renders it

of no legal effect," is of no moment because *Dluhos* did not involve a claim of preemption and the Court was not applying the artful pleading doctrine.

**21.** Plaintiff contends that the instant Complaint is not a toned-down version of the *Zweiman I* complaint because she used the *O'Donnell* complaint as the template for the instant Complaint. (Pl.'s Remand Reply & MTD Opp. 14 n.8.) Plaintiff's argument is misplaced. When performing the artful pleading analysis it is inappropriate to compare complaints filed by different parties in different litigations. *See Shuster v. AXA Equitable Life Ins. Co.,* No. 14–CV8035, 2015 WL 4314378, at *7 n. 11 (D.N.J. July 14, 2015). Indeed, it would be an anomalous result, and inconsistent with the artful pleading doctrine, to allow a plaintiff to escape the significance of the facts and allegations from her prior complaint merely by accepting her claim that

Since I must conduct my SLUSA analysis on a claim-by-claim basis, *see In re Kingate*, 784 F.3d at 142–43, I begin by determining the scope and contours of Plaintiff's theory of liability. Here, Plaintiff only alleges one claim—breach of contract. I find, however, that the gravamen of Plaintiff's claim is that AXA breached the Contract provision requiring AXA to comply with New York law by: (1) materially changing the variable annuity products it sold to customers like Plaintiff without notifying them of these changes; and (2) failing to properly explain the nature of these changes to DFS.

To state a breach of contract claim under New York law, a plaintiff must plead: " '(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach.' " [22] *Vector Capital Corp. v. Ness Techs. Inc.*, 511 Fed.Appx. 101, 104 (2d Cir.2013) (summary order) (quoting *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir.2004)). Zweiman claims that she suffered damages because AXA implemented the ATM Strategy in breach of her Contract. (Compl. ¶ 22.) "Implementation of the ATM Strategy *materially changed* the variable annuity products and reduced the value of plaintiff's and the other Class members' variable annuity accounts." (*Id.* ¶ 12 (emphasis added).) "[T]he policies grant AXA some discretion over investment options, [however], they do not allow AXA to *materially change* such investment options without complying with *applicable law*." (*Id.* ¶ 10 (emphasis added).) And "[i]n its contracts with plaintiff and the other members of the Class,

AXA covenanted that it would comply with *all applicable laws*, including New York law...." (*Id.* ¶ 13 (emphasis added).)

If an effort to save her Complaint, Plaintiff urges that I view portions of Section 2.04 of the Contract in isolation such that two separate clauses are created—a so-called "Compliance Clause" and "Notice Clause." [23] (Pl.'s Remand Reply & MTD Opp. 3.) Once separated, she contends that the Compliance Clause and Notice Clause each provide a separate claim and/or cause of action for breach of contract. (*Id.* at 4–5.) Such a construction is artificial, contrary to the law, and I decline to adopt it.

As an initial matter, Section 2.04 is one section of the Contract entitled "Changes With Respect To Separate Account." (Contract 26–27.) It is not divided into specific clauses called a compliance clause and a notice clause. In any event, Section 2.01 B of the Contract sets forth that the Separate Accounts are established and maintained in accordance with New York law. (*Id.* at 24.) Section 2.04 states that AXA has the right to make changes to the Separate Accounts "subject to compliance with applicable law." (*Id.* at 27.) And Section 2.04 goes on to state that "[i]f the exercise of these rights results in a *material change* in the underlying investment of a Separate Account, you will be notified of such exercise, *as required by law*. (*Id.* (emphasis added).) In reading these provisions together, it is clear that AXA's ability to make changes to the Separate Account was limited by its obligation un-

she patterned her complaint off of a complaint filed in another action. Consequently, I confine my comparison to the prior complaint in *Zweiman I*, which was filed by Plaintiff in this action, Anne Zweiman, against Defendant in this action, AXA.

22. It is undisputed that a valid contract exists.

23. I note that Plaintiff did not explicitly argue that Section 2.04 has two distinct clauses that purportedly create separate claims and/or causes of action for breach of contract until she filed her reply papers.

der the law to notify policyholders of a material change. *See T.M. Real Est. Holdings, LLC v. Stop & Shop Supermarket Co. LLC,* 543 Fed.Appx. 41, 42 (2d Cir.2013) (summary order) ("A contract's clauses 'should be read together contextually in order to give them meaning.'") (quoting *Diamond Castle Partners IV PRC, L.P. v. IAC/Interactivecorp,* 82 A.D.3d 421, 918 N.Y.S.2d 73, 73 (2012)). Indeed, the very harm that Plaintiff complains of is AXA's violation of the law by effecting a material change to her investment policy. (Compl. ¶ 22.) Therefore, Plaintiff's breach of contract theory plainly rests upon the allegation that AXA violated the law by failing to notify her (i.e., a misrepresentation or omission) of a material change. Any other interpretation of the Contract would require me to rewrite the allegations in the Complaint. *See Tolin v. Standard & Poor's Fin. Servs., LLC,* 950 F.Supp.2d 714, 720 (S.D.N.Y.2013).

A review of the *Zweiman I* complaint confirms my reading of the instant Complaint, and reveals that Plaintiff selectively edited her current Complaint to delete "magic words" or "red flags" identifying her claim to be a securities fraud claim precluded by SLUSA. Paragraph 52 of the *Zweiman I* complaint states that: "If the exercise of these rights resulted in a material change in the underlying investment of a separate account, AXA was obligated under [Section 2.04] to notify policyholders, as required by law." (*Zweiman I* Compl. ¶ 52 (alterations omitted; internal quotation marks omitted).)[24] Paragraph 60(c) of *Zweiman I* elaborates, stating that AXA was required under the terms of Plaintiff's variable annuity contract to "no-

tify the certificate owners if the exercise of the Company's right to add, change or remove investment options resulted in a material change in the underlying investment in a separate account." While Plaintiff carefully edited the instant Complaint to remove references to AXA's notification obligations, the underlying Contract, *Zweimcm I* complaint, and instant Complaint—read in conjunction with each other—confirm that the "applicable law" Plaintiff complains AXA to have violated is its legal obligation to notify policyholders of a material change.[25] And as I will explain—it is clear that AXA's failure to notify Plaintiff of this material change to her investment is essential to her claim.

Plaintiff fights against this interpretation by positing that the term "material change" merely emphasizes that the change was not "routine." (Pl.'s Remand Reply & MTD Opp. 10.) However, the problem for Plaintiff is that AXA's contractual obligation to notify her in accordance with the law was triggered by a "material" change. Indeed, this analytical roadblock underscores that the purported two AXA violations of law—failure to notify its policyholders of a material change and failure to obtain proper DFS approval—are intertwined. The *sine qua non* of DFS's determination (and Plaintiff's allegation) that AXA's filing was misleading is that AXA did not explain to DFS how "existing policyholders *who had not elected* to invest in the ATM Strategy could end up invested in such funds." (Consent Order ¶ 3 (emphasis added).) Stated differently, AXA's purported violation of Section 4240(e) began with, and is based upon,

---

**24.** "Zweiman I" refers to Hemr Decl. Ex. 14. (Doc. –14.)

**25.** Plaintiff's denial of such does not take her Complaint outside of SLUSA's prohibition. *Segal v. Fifth Third Bank, N.A.,* 581 F.3d 305,

311 (6th Cir.2009) ("The question under SLUSA is ... whether the complaint covers the prohibited theories, no matter what words are used (or disclaimed) in explaining them.").

AXA's misstatement or omission to its policyholders. AXA's alleged fraud on its policyholders therefore gives rise, and is a factual predicate to, its liability. *See In re Kingate*, 784 F.3d at 146 (SLUSA applies to state law claims predicated on fraud); *LaSala v. Bordier et Cie*, 519 F.3d 121, 141 (3d Cir.2008) ("To be a factual predicate, the fact of a misrepresentation must be one that gives rise to liability, not merely an extraneous detail.").[26] To find otherwise would require me to perform mental gymnastics in an effort to excise allegations that are critical to the success of Plaintiff's claim. This, SLUSA does not permit.

### B. *"In Connection With"*

 Plaintiff posits that the Complaint does not allege that AXA committed a fraud "in connection with" the purchase or sale of a covered security because: (1) Plaintiff purchased her securities before AXA implemented the ATM Strategy; and (2) AXA's misleading disclosure to DFS was not public and therefore could not have induced Plaintiff to buy, sell, or hold her securities. I consider each of these arguments in turn and find them to be unpersuasive.

SLUSA does not define the "in connection with" requirement. However, the Supreme Court provided clarity as to its meaning in two important cases—*Dabit* and *Troice*. An overview of these cases will be helpful in considering the term "in connection with" as it relates to the present matter.

In *Dabit*, the Supreme Court considered whether or not SLUSA precluded so-called "holder" claims where the victims were fraudulently induced—not to sell or purchase—but to retain or delay selling their securities. 547 U.S. at 85–86, 126 S.Ct. 1503. The Court held that it did. *Id.* In so doing, *Dabit* articulated three principles. First, the "in connection with" requirement must be construed broadly. *Id.* at 85, 126 S.Ct. 1503. Second, "it is enough that the fraud alleged 'coincide' with a securities transaction." *Id.* And third, the requisite showing turns on a defendant's "deception in connection with the purchase or sale of any security, not deception of an identifiable purchaser or seller." *Id.* (internal quotation marks omitted).

The Supreme Court recently refined and added to this legal landscape in *Troice*, holding that fraud is "in connection with" a covered security if it is "material" to an individual's (other than the fraudster) decision to buy, sell, or hold a covered security. ── U.S. ──, 134 S.Ct. 1058, 1066, 188 L.Ed.2d 88 (2014). *Troice* did not modify *Dabit*. *Id.* ("We do not here modify *Dabit*."). Rather, it clarified the boundaries and meaning of "coincide." *Troice* was careful to emphasize that its formulation of the "in connection with" requirement was not "new" or "narrow." *See id.* at 1067, 1069–70. Each of the Court's prior articulations of the "in connection with" concept, *see Superintendent of Ins. of St. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12–13, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) ("touching" upon); *United States v. O'Hagan*, 521 U.S. 642, 683, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) ("coincides"); *Dabit*, 547 U.S. at 85, 126 S.Ct. 1503 ("coincides"), "involved a *victim* who took, tried to take, or maintained an ownership position in the statutorily relevant

---

**26.** Since I have determined that Plaintiff's Complaint alleges a misrepresentation or omission. I need not, and decline to, determine whether the Complaint alleges a manipulative or deceptive device or contrivance. 15 U.S.C. § 78bb(f)(*l*).

securities through purchases or sales induced by the fraud." *Troice,* 134 S.Ct. at 1067, 1069 (emphasis added) (internal quotation marks omitted). *Troice* explained that if the "someone" making the investment decision as a result of the fraud is the fraudster, then the fraud is "immaterial" or, in other words, is not a "connection" that matters. *Id.* at 1066.

■ In light of *Troice* and *Dabit,* the "in connection with" doctrine can be articulated as follows: the fraud must be of the type that is material to someone other than the fraudster to buy, sell, or hold a covered security; and, if so, any claim involving that transaction (or lack thereof)—regardless of whether the plaintiff herself was induced to take a position—is precluded. Armed with these controlling principles, I turn to the merits of Plaintiff's arguments.

### 1. Holder Claim

Plaintiff's proposition that AXA's fraud could not induce her securities transaction because she purchased her covered security long before the ATM Strategy barely warrants any discussion. The *Troice* Court expressly held that holder claims fall within SLUSA's parameters. *Troice,* 134 S.Ct. at 1066 (stating SLUSA continues to preclude fraud that induced plaintiffs to hold stock). The temporal relationship between Plaintiff's purchase of her securities and AXA's fraud therefore is of no consequence.[27]

27. *Stephens v. Gentilello,* 853 F.Supp.2d 462 (D.N.J.2012) relied upon by Zweiman is inapposite to this case. In *Stephens,* the court noted that a misrepresentation occurring two years after a purchase could not have induced the purchase. *Id.* at 470. It did not address whether or not the misrepresentation induced the plaintiffs' decision to hold the security.

### 2. Materiality

#### a. *Misrepresentation or Omission to Policyholders*

Turning to materiality—Plaintiff cannot plausibly assert that AXA's fraud concerning its ATM Strategy did not make a significant difference to her decision to hold. Indeed, the Complaint is rife with statements that AXA's failure to notify her of the volatility management strategy was crucial to her investment decision:

- Plaintiff paid a premium for certain guarantee benefits, which "effectively immunized these benefits from the risks attendant to stock market volatility." (Compl. ¶ 9.)
- The ATM Strategy reduced "AXA's exposure to market volatility—the very risks that policyholders paid AXA to assume." (*Id.* ¶ 11.)
- "The effects of the ATM Strategy ... altered the very nature of the product held by [P]laintiff and other policyholders." (*Id.* ¶ 12.)
- "Implementation of the ATM Strategy materially changed the variable annuity products and reduced the value of [P]laintiff's and the other Class members' variable annuity accounts." (*Id.*)

On the bases of these statements, I conclude that Plaintiff's allegations that AXA misrepresented or omitted information concerning the application of the ATM Strategy to Plaintiff "coincided" with and were material to her decision to hold her covered securities. Any other construction would be contrary to the Complaint.

Furthermore, Plaintiff's contention that the "in connection with" requirement is not met because AXA (the purported fraudster) is the only entity or individual to purchase a covered security, (Pl.'s Remand Reply & MTD Opp. 13), fails to recognize that in this case Plaintiff also purchased a covered security—which she held.

### b. *Misrepresentation or Omission to DFS*

Plaintiff argues that AXA's misleading DFS filings were not material to her investment decision because she did not "receive, read, or rely" on them. (Pl.'s Remand Mem. 11; Pl.'s Remand Reply & MTD Opp. 16.) Plaintiff's formulation, however, is not the law.

In articulating "in connection with" as a "material" connection, *Troice* plainly stated that "the scope of this language does not extend further." *Troice*, 134 S.Ct. at 1066. *Troice* went so far as to add color to the meaning of "material" as a "connection that matters" or one that "makes a significant difference" to someone's investment decision. *Id. Troice* did not state that fraud only matters to one who relies on the fraud—which is not surprising because *Dabit* expressly rejected the approach Plaintiff now espouses:

> A narrow construction would not, as a matter of first impression, have been unreasonable; one might have concluded that an alleged fraud is 'in connection with' a purchase or sale of securities only when the plaintiff himself was defrauded into purchasing or selling particular securities. After all, that was the interpretation adopted by the panel in the *Birnbaum* case. But this Court ... has rejected that view. Under our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else. The requisite showing, in other words, is deception in connection with the purchase or sale of any security, not deception of an identifiable purchaser or seller.

*Dabit*, 547 U.S. at 85, 126 S.Ct. 1503; *cf. In re LIBOR–Based Fin. Instruments Antitrust Litig.*, 935 F.Supp.2d 666, 727 (S.D.N.Y.2013) ("[A]lthough showing that the plaintiff purchased a security in reliance on a misrepresentation or omission by the defendant regarding the security's value would likely be sufficient to satisfy the 'in connection with' element, such a showing would not be necessary."). Indeed, *Dabit* makes clear that the fraud need not be directed to the plaintiff to satisfy the "in connection with" requirement. Instead, the focus is "on the conduct of the defendants rather than the identity of the plaintiffs." *See Rabin v. JPMorgan Chase Bank, N.A.*, No. 06–CV–5452, 2007 WL 2295795, at *7 (N.D.Ill. Aug. 3, 2007).

The public versus non-public nature of the DFS filing is therefore of no moment. Rather, the key question is whether or not the misleading DFS filing made a difference to an investor's decision regarding her covered security. I find that it did.

Absent valid DFS approval, AXA would not have been legally permitted to introduce the ATM Strategy to Plaintiff's variable annuity policy. (Compl. ¶¶ 10–13; Pl.'s Remand Reply & Opp. 1.) Therefore, AXA's fraud on DFS—the misleading DFS filing—enabled it to introduce this strategy to Plaintiff's investment portfolio. And as explained at length, Plaintiff complains that the introduction of the ATM Strategy had a material and negative impact on her covered security. The direct connection between AXA's fraud on DFS and the harm Plaintiff claims belies any notion that AXA's misleading DFS filing did not "coincide" with, and made no difference to, Plaintiff's decision to hold, (*see* Pl.'s Remand Reply & Opp. 17). *See In re LIBOR–Based Fin. Instruments*, 935 F.Supp.2d at 729–730 (finding RICO claim barred by PSLRA, and "in connection with" requirement met, where the defendants' sale of securities to the plaintiffs was closely dependent on false statements

to a banking association despite plaintiffs' lack of reliance on the false statement).

Plaintiff's Complaint therefore alleges misrepresentations or omissions by AXA "in connection with" covered securities transactions.[28] As a result, Plaintiff's claim is preempted by SLUSA and must be dismissed.

## IV. *Conclusion*

For the reasons discussed above, Plaintiff's putative class action falls within the purview of SLUSA, and must therefore be DISMISSED. Accordingly, Plaintiff's motion to remand this action to state court is DENIED, and AXA's motion to dismiss is GRANTED. The Clerk of the Court is respectfully directed to terminate the pending motions and close this case. (Docs. 16, 27.)

SO ORDERED.

---

28. On July 14, 2015, after briefing in this matter was complete, Plaintiff brought *Shuster*, 2015 WL 4314378 to my attention. (Doc. 34.) Defendant responded by letter the following day. (Doc. 35). In *Shuster*, the plaintiff brought suit relying on the same Consent Order at issue here. Although Judge Kugler in *Shuster* held that the "class would be required to prove a misrepresentation by AXA" and that misrepresentation gave rise to liability, he also held that AXA's fraud was not "in connection with" the plaintiff's security transaction in that case. *Shuster*, 2015 WL 4314378, at *6. *Shuster* is inapplicable to my analysis here because the plaintiff in *Shuster* had not filed a previous complaint and the covered securities at issue in *Shuster* were insurance policies that were not the subject of DFS's Consent Order. *Id.* at *7. Indeed, Judge Kugler agreed with my assessment that *Shuster* and this case each must be assessed on their own, stating: "AXA's inundation of references to *Zweiman* is generally unhelpful. If Judge Broderick decides dismissal under SLUSA is appropriate in *Zweiman*, it will undoubtedly be because the allegations in that complaint and his considerations of the law led to that conclusion." *Id.* at *7 n. 11.