17-1085-cv
*O'Donnell v. AXA Equitable Life Ins. Co.*

# In the
# United States Court of Appeals
## For the Second Circuit

————

August Term 2017

Argued: October 25, 2017
Decided: April 10, 2018

No. 17-1085-cv

RICHARD O'DONNELL, on behalf of himself and all others similarly situated,
*Plaintiff-Appellant,*

*v.*

AXA EQUITABLE LIFE INSURANCE COMPANY,
*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of New York
Vernon S. Broderick, District Judge, Presiding.

Before: JACOBS, SACK, AND PARKER, *Circuit Judges.*

————

A variable annuity policy holder brought a putative class action in state court alleging a breach of contract by an insurance company when it introduced a volatility management strategy to the policies without full compliance with state law. The insurance

company, citing an alleged misrepresentation to a state regulator, removed the case to federal court where it sought dismissal. The United States District Court for the Southern District of New York, (Broderick, *J.*), granted dismissal, concluding that the Securities Litigation Uniform Standards Act (SLUSA) precluded the suit. The variable annuity holder appeals. We conclude that a holder's passive retention of a security following a misrepresentation of which the holder is unaware lacks the "in connection with" requirement for SLUSA preclusion. Accordingly, we **REVERSE** the judgment of the District Court and **REMAND** with instructions to remand the case to Connecticut state court.

————

JOEL C. FEFFER AND DANIELLA QUITT, Harwood Feffer LLP, New York, NY, for Plaintiff-Appellant.

JAY B. KASNER AND KURT WM. HEMR, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendant-Appellee.

————

BARRINGTON D. PARKER, *Circuit Judge*:

The Securities Litigation Uniform Standards Act of 1998 ("SLUSA") precludes plaintiffs from bringing certain class actions in state court that allege fraud in connection with the purchase or sale of nationally traded securities. 15 U.S.C. § 78bb(f)(1). In this putative class action, plaintiff-appellant Richard T. O'Donnell sues on behalf of himself and other variable annuity holders as customers of defendant-appellee AXA Equitable Life Insurance Co. ("AXA"). O'Donnell alleges that AXA implemented a volatility management

strategy for its variable annuity policies in breach of its contractual duties to him and the other variable annuity holders.

If SLUSA is applicable, then O'Donnell would be barred from maintaining this class action in state court and the action would be removable to federal court where it must be dismissed. 15 U.S.C. § 78bb(f)(1). In seeking state regulatory approval for the implementation of the volatility management strategy, AXA was charged with misleading the New York State Department of Financial Services ("DFS"), and eventually reached a settlement with that department. On this ground, the Appellee removed this action to federal court, arguing—solely for the purpose of SLUSA removal and dismissal—that O'Donnell's breach of contract action depends on a misrepresentation (AXA's alleged misrepresentation to the New York state regulator). In this vein, AXA argues, the alleged misrepresentation was made in connection with the purchase or sale of a SLUSA-covered security, and, thus, SLUSA preclusion applies. The action was eventually transferred to the United States District Court for the Southern District of New York (Broderick, *J.*) which dismissed it. *See O'Donnell v. AXA Equitable Life Ins. Co.*, No. 15-CV-9488 (VSB), 2017 WL 1194479 (S.D.N.Y. Mar. 30, 2017).

On this appeal, we are asked to determine whether a putative class action complaint is precluded by SLUSA where the alleged misrepresentation was made to a state regulator and unknown to the holders of the security. We conclude that a holder's passive retention of a security following a misrepresentation of which the holder is unaware fails the "in connection with" requirement for SLUSA preclusion. Accordingly, we reverse the judgment of the District Court and remand with instructions that this action be remanded to Connecticut state court.

## I. BACKGROUND[1]

In November 2008 O'Donnell purchased a variable deferred annuity policy from AXA. Briefly, a variable annuity contract is an insurance contract that has an investment component under which an individual makes a single payment (or a series of payments) to an insurer who in return agrees to make periodic payments to the individual beginning either immediately or at some future date. *See, e.g.*, *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 104 (2d Cir. 2001). Variable annuities are "'hybrid products,' possessing

---

[1] The following facts are taken from the Appellant's complaint unless otherwise noted. "JA" refers to the parties' joint appendix.

characteristics of both insurance products and investment securities." *Id.* at 105 (citation omitted). Unlike the beneficiary of a fixed annuity, the beneficiary of a variable annuity bears the investment risk of the underlying securities. *Id.* Moreover, because the level of benefits is not fixed, but will vary depending on the investment portfolio, many consumers use variable annuities as a tool for accumulating greater retirement funds by exposing themselves to greater market risk. *Id.* Variable annuities are sold primarily by insurance companies and must be offered through "separate accounts" that are registered with the Securities and Exchange Commission under the Investment Company Act of 1940.[2] *Id.*

The policy that O'Donnell purchased allowed him to allocate his premiums among various investment options with different risk-reward characteristics. Specifically, O'Donnell invested value in AXA's "Separate Account No. 49." JA 97. When O'Donnell

---

[2] The Investment Act of 1940 defines a "separate account" as "an account established and maintained by an insurance company pursuant to the laws of any State or territory of the United States, or of Canada or any province thereof, under which income, gains and losses, whether or not realized, from assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company." 15 U.S.C. § 80a–2(37).

5

purchased his variable annuity, he agreed and acknowledged that if he chose to invest his account value in Separate Account No. 49—rather than electing to receive interest at a rate declared by AXA—he would incur investment risk and investment results would not be guaranteed by AXA. *Id.* 419. However, O'Donnell's policy allowed him to purchase for an additional premium a guarantee that certain benefits would increase by a minimum percentage each year. This guarantee, combined with policy reset provisions, effectively reduced the volatility risks to which he otherwise would have been exposed.

O'Donnell's policy provided that AXA may invest the assets in the separate account in its discretion, as "permitted by applicable law." JA 110. Also "subject to compliance with applicable law," the policy permitted AXA to make certain material changes to the accounts. *Id.* 113. For any changes that AXA planned to make to its separate accounts, New York Insurance Law Section 4240(e) required AXA to file with the DFS a request to amend and restate its plans of operation. *Id.* Finally, the policy provided that "[i]f the exercise of these rights results in a material change in the underlying

6

investment of a Separate Account," AXA was required to notify policyholders that it had done so (as required by law). *Id.*

In 2009 AXA introduced a volatility management strategy designed to tactically manage equity exposure to Standard & Poor's 500 companies based on the level of volatility in the market. *Zweiman v. AXA Equitable Life Ins. Co.*, 146 F. Supp. 3d 536, 542 (S.D.N.Y. 2015). This strategy, labeled the "AXA Tactical Manager Strategy," (the "ATM Strategy") reduced AXA's risks by using derivatives to hedge its own equity exposure to market volatility at the expense of the variable annuity policyholders who purchased their policies, in part, for the opportunity to benefit from market volatility. JA 40. The ATM Strategy is designed to smooth a fund's returns during periods of high market volatility. However, the application of the ATM Strategy may limit the gains that may otherwise accrue to a policyholder's account during periods of high volatility. *Id.*

The New York insurance code requires AXA to file with the DFS plans of operation which describe the investment options for each of its separate accounts. *See* N.Y. Ins. Law § 4240(e). Prior to introducing the volatility-managed investment options into AXA's

separate accounts, AXA filed amended plans of operation. The DFS subsequently approved the filings, but, as explained below, later criticized AXA for misleading it as to the scope and potential effects of the strategy. JA 40. AXA also made filings with the SEC before introducing the ATM Strategy. As with many other securities offerings, the investment options in AXA's separate accounts are offered pursuant to prospectuses filed with the SEC and provided to annuity holders. *See, e.g.*, *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120 (2d Cir. 2011). A May 2009 prospectus informed annuity holders about the introduction of the volatility management strategy into certain portfolios in which O'Donnell had invested. JA 447–49. Moreover, an August 2009 prospectus supplement, applicable to O'Donnell's investments, indicated that the ATM Strategy would be "[e]ffective on or about September 1, 2009 . . . ." *Id.* 455.

### A. Consent Order

In 2011, the DFS began investigating AXA's implementation of the ATM Strategy and, specifically, whether AXA had properly disclosed to the DFS the scope of the changes. *Id.* 38. Following its investigation, the DFS concluded that AXA failed to adequately inform it that it was implementing its ATM Strategy "in a manner

8

that substantially changed its variable annuity products." *Id.* In March 2014, AXA settled with the DFS. *Id.* It entered into a Consent Order in which, among other things, the DFS found that AXA violated New York Insurance Law section 4240(e) by filing the plans of operation without "adequately informing and explaining to the Department the significance of the changes to the insurance product." *Id.* 42. The DFS also found that the implementation of the ATM Strategy "effectively changed the nature of the product that the policyholders purchased, yet AXA did not explain in its filings to the Department that it was making such changes to its variable annuity products." *Id.* 41. The DFS further found that "[t]he absence of detail and discussion in the filings regarding the significance of the implementation of the ATM Strategy had the effect of misleading the Department regarding the scope and potential effects of the ATM Strategy . . . ." *Id.* The DFS noted that it approved the filings because it was led to believe the changes were simply routine additions of funds. *Id.* The DFS concluded that had it been aware of the changes, "it may have required that the existing policyholders affirmatively opt in to the ATM Strategy." *Id.*

## B.    Proceedings Below

After the entry of the Consent Order, many plaintiffs, including O'Donnell, brought putative class action suits.  O'Donnell initiated this action in Connecticut state court.  *O'Donnell*, 2017 WL 1194479, at *2.  He alleged a breach of contract claim premised on AXA's alleged failure to comply with the terms of the policies that AXA had sold to O'Donnell and other members of the putative class.  Specifically, O'Donnell alleged that, in violation of Section 4240, AXA breached the terms of the policy when it implemented the ATM Strategy without obtaining prior approval.  O'Donnell purported to sue on behalf of himself and all other similarly situated variable annuity policyholders who allocated funds into separate accounts which implemented the ATM Strategy.

Citing, among other things, the alleged misrepresentations to the DFS, AXA removed the action to federal court (the District of Connecticut), where it successfully moved, over O'Donnell's objections, to transfer the case to the Southern District of New York.  There, O'Donnell moved to remand the action to state court and AXA cross-moved to dismiss the complaint as precluded by SLUSA.  *Id.*

The District Court held that the putative class action complaint was precluded by SLUSA and dismissed the action. In doing so, the District Court construed the contract claim as being essentially the same as the claim that it disposed of in a similar action, *Zweiman v. AXA Equitable Life Ins. Co.*, 146 F. Supp. 3d 536 (S.D.N.Y. 2015). In the *Zweiman* action, as here, the plaintiff premised a breach of contract claim on the assertion that AXA breached by implementing a material change to the variable annuity policy without obtaining prior approval from state regulators. *O'Donnell*, 2017 WL 1194479, at *2. In both actions, despite the plaintiffs' framing, the District Court interpreted the complaints as alleging a "misrepresentation or omission" on the part of AXA in connection with a decision to hold securities and concluded that SLUSA applied. *Id.* at *2–3. This appeal followed.

## II. STANDARD OF REVIEW

We review a district court's grant of a Rule 12(b)(6) motion to dismiss *de novo*, accepting all factual claims in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 135 n.11 (2d Cir. 2015). To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

We review a district court's denial of a motion to remand *de novo*. *Cal. Pub. Emps.' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004). In reviewing a denial of a motion to remand, "the defendant bears the burden of demonstrating the propriety of removal." *Id.* (internal quotation marks and citation omitted)

## III. DISCUSSION

Under SLUSA, covered class actions that allege state law securities fraud in connection with the purchase or sale of covered securities are removable to federal court where they there must be dismissed. *Romano v. Kazacos*, 609 F.3d 512, 517–18 (2d Cir. 2010); *see also Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund* , 138 S.Ct. 1061, 1067 ( 2018). Specifically, a class action is properly removed to federal court and dismissed where the state action is:

(1) a "covered class action";

(2) based on state statutory or common law;

(3) concerning a covered security; and

(4) alleging that defendants made a misrepresentation or

omission of a material fact . . . in connection with the purchase

or sale of that security.

*See* 15 U.S.C. § 78bb(f). When determining whether SLUSA applies to a complaint, courts may apply the "artful pleading rule" and "look beyond the face of the . . . complaint[] to determine whether [it] allege[s] securities fraud in connection with the purchase or sale of covered securities." *Romano*, 609 F.3d at 519; *see also In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d at 140 (observing that "plaintiffs should not be permitted to escape SLUSA by artfully characterizing a claim as dependent on a theory other than falsity when falsity nonetheless is essential to the claim").

Here, there is no dispute that the complaint meets three of SLUSA's requirements: (1) the action is a "covered class action," (2) the action is based on state common law, and (3) the action involves a "covered security." Thus, the dispute before us involves the fourth requirement: whether the complaint alleges a misrepresentation or omission of material fact in connection with the purchase or sale of a security. This inquiry breaks down into two parts, both of which are required for preclusion under SLUSA: (i)

13

whether the complaint alleges a misrepresentation or omission of a material fact and (ii) if so, whether the misrepresentation or omission was made in connection with the purchase or sale of a SLUSA-covered security.

We conclude that the alleged misrepresentation was not made in connection with the purchase or sale of a SLUSA-covered security. Because we conclude that part two of this inquiry was not met, we need not reach the first one.

**A.  In Connection With**

The District Court considered the language "in connection with" the purchase or sale of covered securities in light of *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) and *Chadbourne & Parke LLP v. Troice*, 134 S.Ct. 1058 (2014). The District Court concluded that the fraud alleged must be material to the decision to buy, sell, or hold a covered security, and if so, any claim involving such a transaction is precluded by SLUSA. *O'Donnell*, 2017 WL 1194479, at *2–3.

We are in accord with this view. Moreover, we also agree with the District Court that *Dabit* and *Troice* provide that so-called "holder" claims—in which the victims were fraudulently induced to

14

retain or delay selling securities—are also precluded under SLUSA. We note that in *Dabit*, however, the "holder" claim was express: the plaintiffs alleged that the defendant's "misrepresentations and manipulative tactics caused [the plaintiffs] to hold onto overvalued securities," long after they would have otherwise sold them. 547 U.S. at 75–76. The Supreme Court explained that it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else. *Id.* at 85 (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)). In *Troice*, the Supreme Court further clarified SLUSA preclusion, noting that in *Dabit*, SLUSA precluded a suit in which the alleged fraud was "material to and coincided with third-party securities transactions, while also inducing the plaintiffs to hold their stocks long beyond the point when, had the truth been known, they would have sold." *Troice*, 134 S.Ct. at 1066–67 (internal quotation marks, alteration, and citation omitted) (noting prior case law which involved a plaintiff who "took, tried to take, or *maintained* an ownership position . . . induced by the fraud" (emphasis added)). In short, both *Dabit* and *Troice* indicate that an inducement to action or forbearance can satisfy the "in connection with" requirement. *See id.*

Here, AXA invites us to conclude that O'Donnell has pled a "holder" claim in a context where the alleged misrepresentation was made to a regulator and unknown to the holders of the securities. We decline this invitation. The complaint is bereft of any allegations that an actual securities transaction ever occurred. Moreover, the complaint does not plausibly allege—nor support a reasonable inference—that any decision to hold by O'Donnell was made that was related in any way to any misstatements to the DFS. *See Troice*, 134 S.Ct. at 1066–67 (highlighting materiality requirement).

AXA contends that O'Donnell alleges a breach of contract and an actionable misrepresentation by AXA when, in violation of New York law, in implementing the ATM strategy, it failed to properly explain the nature of the changes to the DFS. Key for SLUSA preclusion, however, the alleged misrepresentation here was by AXA to the DFS, but not by AXA to O'Donnell, or other putative class members. In fact, there is no allegation or indication that O'Donnell and the putative class members were ever aware of the misrepresentation that AXA made to the DFS.

Consequently, we see no link between the misrepresentation (to a regulator) and the inaction of a securities holder following

misrepresentations of which the holder was unaware. *Troice* brings this point home. There, the Supreme Court stated that "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security." *Troice*, 134 S.Ct. at 1066. For these reasons we conclude that the misrepresentation could not have been made "in connection with" the purchase or sale of a covered security because the misrepresentation could not have been "material to a decision by one or more individuals . . . to buy or sell a covered security," for the simple reason that it was unknown to the them. *See id.* In other words, there is no plausible allegation in the complaint that any decision to hold a security occurred that was related in any way to AXA's disclosures to the DFS. *Cf. Shuster v. AXA Equitable Life Ins. Co.*, No. 14-8035 (RBK/JS), 2015 WL 4314378, at *7 n.12 (D.N.J. July 14, 2015) (concluding no SLUSA preclusion where "none of the facts indicate that a decision to purchase, sell, or hold covered securities was incidental to AXA's conduct").

We recognize that in *Dabit*, the Court stated that "it is enough that the alleged fraud 'coincide' with a securities

17

transaction—whether by the plaintiff or by someone else." *Dabit*, 547 U.S. at 85 (observing that "[t]he requisite showing . . . is deception in connection with the purchase or sale of any security, not deception of *an identifiable purchaser or seller*." (internal quotation marks and citation omitted) (emphasis added)). Moreover, under the artful pleading rule, as we explained in *Romano*, courts are to look beyond the face of an "'artfully pled' complaint to determine whether [a] plaintiff has 'cloth[ed] a federal law claim in state garb' by pleading state law claims that actually arise under federal law." 609 F.3d at 518 (quoting *Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 758 (2d Cir. 1986)); *see also Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 304 (3d Cir. 2005) (directing inquiry into whether a "reasonable reading of the complaint evidences allegations of a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" (internal quotation marks omitted)). However, here, we are satisfied, first, that a misrepresentation to a regulator and the inaction of a securities holder following a misrepresentation of which the holder is unaware did not affect the holder's decisions with respect to holding or disposing of securities and, second, that the misrepresentation did

18

not "coincide" with a securities transaction where none is alleged to have occurred or to have been forestalled, delayed or inhibited. A contrary decision would be a bridge too far even for the artful pleading rule.

Finally, we note that the implementation of the ATM strategy was disclosed publicly in a May 2009 prospectus and in an August 2009 supplement. AXA's argument, however, turns on the failure to disclose changes to the DFS and not on these public disclosures. Here there is no allegation (or a reasonable inference) that, in these later disclosures, AXA misled O'Donnell or the market more generally or that the market was aware of AXA's misrepresentation to the DFS.

## IV. CONCLUSION

For the forgoing reasons, we **REVERSE** the judgment of the District Court and **REMAND** with instructions to remand the case to Connecticut state court.